**ACME PROCESS EQUIPMENT CO., to Its own Use, and for the Use and Benefit of Kingston Tool Company, Nicholson Products Company, K & G Sales Company, All Metals Industries, Inc. and the Pittsburgh National Bank, Successor to the People's First National Bank & Trust Co., Assignee of All Metals Industries, Inc.**

v.

**The UNITED STATES.**

No. 538–59.

United States Court of Claims.
June 11, 1965.

---

43. We do not reach the issue of whether there would be a taking (for which just compensation should be paid) if bad faith on the part of the defendant had been shown. In addition, we point out that the statute of limitations bars recovery by the plaintiff on this ground. Acme first alleged a Fifth Amendment taking in an amendment to its petition, filed in September 1961. Since the amendment stated a new cause of action, it had to be filed within six years after the claim accrued. See Dawnic Steamship Corp. v. United States, 90 Ct.Cl. 537, 580 (1940).

But all events fixing the defendant's liability for the alleged taking had occurred on or before January 1, 1955. Plaintiff's claim having accrued by that date, it is barred by the six-year statute of limitations. The fact that settlement of negotiations continued thereafter is irrelevant. See, e.g., Cuban Truck & Equipment Co. v. United States, Ct.Cl. No. 245–57, decided June 12, 1964, 333 F.2d 873, 877–879; Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 411, 142 Ct.Cl. 165, 168 (1958).

Jack Rephan, Washington, D. C., for plaintiff. Solomon Dimond, Washington, D. C., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Hyman Lazeroff, Gravelly Point, Va., and James F. Merow, Washington, D. C., of counsel.

Before LARAMORE, DURFEE, and DAVIS, Judges, and JONES and WHITAKER, Senior Judges.[1]

DAVIS, Judge:[2]

In January 1953, plaintiff entered into two separate contracts with the Army, one for the production of elevating and traversing assemblies and the other for the manufacture of 75 mm. rifles. The present claims grow out of the termination of the former contract for the Government's convenience.[3] There are in effect two independent demands, one urged by the Acme Process Equipment Company as prime contractor for itself and all of its subcontractors save one, and the other on behalf of All Metals Industries, Inc., the principal subcontractor.

The contract out of which the claims arise was executed on January 7, 1953, by the Rock Island Arsenal of the Army Ordnance Corps and administered by the Philadelphia Ordnance District. The Government terminated the agreement for its own convenience on March 17, 1954, before any deliveries had been made. The affected parties duly filed termination claims on a total cost basis and for the next three years negotiated fruitlessly to reach a settlement. Finally, on June 19 and 20, 1957, the contracting officer made findings as to amounts due Acme and All Metals, and thereafter an appeal was taken to the Armed Services Board of Contract Appeals. The claimants engaged in subsequent negotiations with the contracting officer to achieve a settlement notwithstanding the pendency of the appeal, but these resulted only in the filing of new claims in increased amounts, the issuance of revised findings superseding the original ones, and the submission of modified appeals to the Board. In the meantime partial

1. At the time this case was argued, May 6, 1964, JONES, Senior Judge, was Chief Judge of the court. This decision has been deferred pending disposition of the companion case, 347 F.2d 509 No. 349–57, since the parties stipulated that the record in the latter was to be considered in the determination of the present case.

2. The court acknowledges the significant contribution of Commissioner C. Murray Bernhardt, from whose opinions (in this case and its companion, see note 1, supra, and note 3, infra) we have borrowed considerably. We do, however, come to a number of conclusions at variance with his, and do not consider some issues which he discussed.

3. The other contract was subsequently canceled by the defendant, and it forms the subject matter of the companion case, No. 349–57, also decided this day.

payments were made on the claims. The Board decided that a net balance of $21,518.73 was due on the Acme claim after crediting a part payment of $20,000, and that All Metals was entitled to an additional $32,879.01, after crediting partial payments of $50,040.28. On motions for reconsideration, the Board reduced the net amount due on the All Metals claim to $18,096.38.

### FAILURE TO PAY THE BOARD'S AWARD

Following the Board's final determination, the defendant declined to disburse the amounts awarded to the claimants unless they filed general releases without reservations or exceptions. Plaintiff asserts that this refusal breached Article 21(g) of the contract, which states that "if an appeal has been taken" from the decision of the contracting officer, the Government is to pay "the amount finally determined on such appeal." The contractor argues that "appeal" comprehends only subsequent actions within the executive department, and not those ultimately taken to this court. The contention is that, after a favorable final decision by the chief of an executive department (or a board, as his duly authorized representative), the defendant is obliged forthwith to pay the contractor the amount awarded, and failure to do so breaks the contract.

■ Although in other circumstances there may be some merit in this position, it is unavailing here. Acme's point is that the defendant and the court are bound by all those administrative determinations of fact which the contractor does not challenge. On the basis of this purported finality, it is argued that, since we may not reduce the figure awarded by the Board, the contractor has necessarily

incurred damages in that amount.[4] The premise is untenable, as this court has recently held: "Whatever may have been the rule or the practice before the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322, that statute compels us to reject plaintiff's suggestion. It is in effect asking that we read into all government contracts (with Disputes clauses) the provision that a [factual] claim otherwise properly before the court may not be decided on the merits if there was a prior administrative determination favorable to the contractor, i. e., a clause that administrative determinations for the contractor are automatically conclusive [absent fraud]. The standard Disputes clause does not and cannot now contain such a limitation, because the Wunderlich Act specifically prohibits the inclusion in a government contract of any clause making the decisions of an administrative official on questions of law *or* fact completely final and free from judicial review. 68 Stat. 81, 41 U.S.C. §§ 321–322. The Act, phrased in universal terms, makes no qualification or exception for administrative orders sustaining the contractor. The opinions which may indicate a contrary position were all handed down before the passage of the Wunderlich legislation. In cases decided subsequent to its enactment, this court has not hesitated to reexamine administrative determinations upholding the contractor, and to upset them if the standards for review set forth in the statute call upon us to conclude that the decision below should not stand." C. J. Langenfelder & Son, Inc. v. United States, Ct.Cl., 341 F.2d 600, 607, decided Feb. 19, 1965 (citations and footnotes omitted.) [5]

■■ Acme wishes to use this court as a means of automatically enforcing an

---

4. Plaintiff has made no additional or alternative request for damages in the form of interest on the Board's award for the interim period between its decision and that of this court. Such an interest payment would clearly be precluded by 28 U.S.C. § 2516(a): "Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only

under a contract or Act of Congress expressly providing for payment thereof." This contract did not so provide.

5. The bracketed additions reflect the present plaintiff's qualifications of the broad position advocated by the contractor in Langenfelder, but the reasoning of that case remains applicable.

administrative decision in its favor. The Wunderlich Act forbids that result. Rather, when a contractor believes the Government is wrongfully withholding his funds, the courts afford a remedy only if he shows his entitlement under the standards of review set forth in the Act. Aside from true settlements or compromises, the parties cannot by-pass the statute by endowing administrative decisions (favoring one side or the other) with absolute finality in advance. In this case, the defendant has come to concede that the Board was correct in awarding $21,518.73 to Acme, but the Army did not breach the contract simply by refusing at first to accept the Board's decision. The breach was the failure to pay plaintiff what was rightfully owing to it on the items considered by the Board, not the refusal to acquiesce blindly in the Board's award. Plaintiff may not recover on this basis.

## THE ACME CLAIM

In addition to the Board's net allowance to Acme of $21,518.73, which the defendant no longer contests, the plaintiff claims to be entitled to $5,200 for post-termination legal and accounting expenses disallowed by the Board,[6] and $5,907.56 deducted because of a violation of the covenant against contingent fees.

*Post-Termination Expenses.*—Article 21 of the general provisions of the contract governs the procedures obtaining when the Government terminates a contract for its own convenience. Among the expenses incurred by the contractor which the United States agrees to reimburse are "the reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims * * *." The same contract article incorporates by reference Armed Services Procurement Regulation 8–402(c) (9), which specifically disallows expenses incurred in any formal appeal, either within an executive agency or in court.[7]

Acme's termination claim included $3,500 for the legal services of Solomon

6. Acme originally petitioned the court for additional post-termination legal and accounting expenses of $7,600. The plaintiff has not, however, renewed a claim of $2,400 for legal services rendered by Morris C. Solomon, after its disallowance by the Trial Commissioner in his opinion. We accept the Commissioner's determination on this point. He said: "In its original termination claim Acme did not include an item of post-termination settlement expense in the amount of $2,400 for legal services rendered by Morris C. Solomon, Esq., in the preparation of the claim and in dealing with subcontractors who had presented their claims to Acme. This claim was urged for the first time in the appeal filed with the Board. The Board denied the claim on the grounds that Mr. Solomon had been employed by the plaintiff for a number of years as legal counsel on an annual retainer basis, and that the services which he rendered in connection with the preparation and presentation of the termination claim consisted only of advice for which he was compensated in his annual retainer fee. Part of the disallowance was also based on the fact that certain of the included services related to the appeal and litigation of the claim. Up to the time of the hearing before the Board Mr. Solomon had not billed the plaintiff for the claimed services. It is reasonable to conclude that, as between Mr. Solomon and the plaintiff, the latter's obligation to Mr. Solomon is informally contingent upon the obligation of the defendant to Acme as determined in this court, and that in the absence of an ultimate award there will be neither a demand or payment between Mr. Solomon and Acme. Under these circumstances the Board's decision was undoubtedly correct. Acme has incurred only a contingent obligation to pay Mr. Solomon for his services, and there is nothing clearly erroneous in the Board's determination that the retainer fee was designed to cover such services as Mr. Solomon performed."

7. ASPR 8–402(c) (9) disallows: "Legal, accounting and consulting services and related expenses incurred by a prime contractor or a subcontractor in any formal appeal or submission, either within a contracting or other Government agency, or in any arbitration, mediation or suit in court, where such proceeding is instituted by such Contractor for the purpose of obtaining payment in excess of the settlement amount determined to be due by the Government or any intervening higher tier Contractor."

Dimond, who first entered the case in connection with the preparation and filing of the appeal to the Board. From September 1957 to April 1958, the period for which the fee is claimed, Mr. Dimond's work consisted primarily of negotiations with the contracting officer to settle the pending claim. Because the prospect of settlement was in the offing, the Board granted the defendant, on October 21, 1957, a seventy-day extension of time (until December 30) within which to file its answer. The Government's request that the appeal be classified as "awaiting administrative disposition" was also granted. When efforts to compromise the matters in dispute broke down in early December, Mr. Dimond continued negotiating with the contracting officer until April for the purpose of obtaining revised findings from which to appeal. The Board disallowed the claim for his services during the entire period because "they were rendered in connection with the appeal, even though they include unsuccessful negotiations to settle it. They were not rendered in connection with the original preparation and presentation of the termination settlement proposal." Our Trial Commissioner, in his opinion, reversed the Board's determination, allowing reimbursement for the full amount claimed.

■ We are concerned essentially with the meaning of the pertinent provisions of contract article 21 and the incorporated regulation, which permit reimbursement for "reasonable costs of settlement." On this question of law, the prior administrative determinations are, of course, not binding. 41 U.S.C. § 322. In support of the restrictive view adopted by the Board, the defendant relies heavily on ASPR 8–402(b) (27), allowing compensation for "reasonable * * * legal * * * expenses necessary in connection with the termination and settlement of the contract * * * but only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in

connection therewith", as well as on ASPR 8–402(c) (9), supra, disallowing "legal * * * services and related expenses incurred by a prime contractor * * * in any formal appeal or submission * * *." The Government reads these limitations in conjunction with contract clauses 21(d) and (e); under those provisions, the amount owing to the contractor after a termination for convenience is to be determined either by a negotiated agreement or, if the parties cannot agree, by a unilateral decision by the contracting officer, which is subject to appeal. Once the contracting officer takes such unilateral action, it is urged, a "termination settlement" has occurred, and any subsequent settlement efforts must be in connection with the appeal. This, the Government says, precludes reimbursement.

■■ Defendant's explication of the texts of the regulations is unconvincing. A more natural reading indicates no such partition of the legal expenses connected with settlement negotiations between those incurred prior to a unilateral determination and those after. Rather, the dividing line has been drawn between (1) all *settlement* costs and (2) "legal * * * services and related expenses incurred by a prime contractor or a subcontractor in any formal appeal." The contract and regulations do not say that *all* legal services rendered subsequent to the filing of an appeal are to be disallowed, *ipso facto*, for purely chronological reasons. Instead, an attorney's services are allowable costs to the extent they consist of settlement negotiations with the contracting officer, in contrast to activities directly bearing on the appeal proceedings (such as preparation and filing of pleadings and briefs). The nature and form of the legal activities involved are more objective standards for determining if they may be reimbursed than their relationship in time to the filing of an appeal to the Board. We hold that the legal expenses incurred by plaintiff in its efforts to obtain a settlement, whether before or after the appeal to the Board, are

compensable costs under the contract and incorporated regulations.[8]

■ Defendant next asserts that, even if settlement expenses subsequent to a formal appeal may be reimbursed, the court should allow only a fraction of the amount requested by Acme and permitted by the Trial Commissioner: the award should be limited to the fees incurred for Mr. Dimond's services from October 21 to December 2, 1957, rather than from September 1957–April 1958. On October 21, defendant first requested the Board to extend the time for filing the Government's answer because of settlement negotiations then in process. In a letter dated December 2nd, Mr. Dimond advised the Philadelphia Ordnance District that its compromise offer was unacceptable and that appeal proceedings before the Board would be continued. But according to affidavits of Ordnance District representatives, which were submitted in evidence before the Board, Mr. Dimond's efforts to settle the dispute began considerably before October 21 and may well have extended beyond December 2. Mr. Dimond's subsequent services (for which compensation is claimed) did deal in large part with obtaining detailed findings from which Acme could appeal; but it is very unlikely that there were no settlement negotiations regarding individual items during this period. In such circumstances, the Government's bare allegation that the dates it has selected are determinative has little force; and we have been given no other method of apportionment. Defendant has thus failed to overcome the presumption of correctness attaching to the Commissioner's finding. Rule 66; e. g., Dodge Street Bldg. Corp. v. United States, Ct.Cl., 341 F.2d 641, decided Feb. 19, 1965; Davis v. United States, Ct.Cl., No. 179–59, decided Feb. 14, 1964, slip op., pp. 4–5. Plaintiff is entitled to recover post-termination legal fees of $3,500.

■ Acme also requests $5,000 for the services of its certified public accountants in preparing the termination claim. They agreed to perform this work on a fee basis of $150 per day, as contrasted to $200 per day which the firm customarily charged Acme for regular monthly services. Plaintiff actually paid its accountants a flat fee of $5,000 for preparation of the termination claim, amounting to $113.64 per day for the 44-day period which the Board found had been used. The contracting officer allowed reimbursement of only $2,550, computed at the rate of $75 per day for 34 days. The Board increased the compensable amount to $3,300, calculated at $75 per day for 44 days. The rate found

8. Settlement expenses after an appeal has been taken are expended not to facilitate the appeal, but to prevent it. As we have pointed out, the proper dividing line is between negotiation and litigation, rather than the particular point in time when a formal appeal is filed. The cases cited by defendant all appear to involve the disallowance of actual litigation expenses; the technical fact that an appeal had been formally initiated was not emphasized. See Marshall v. United States, 164 F. Supp. 221, 223, 143 Ct.Cl. 51, 55 (1958); Ramsey v. United States, 101 F.Supp. 353, 357, 121 Ct.Cl. 426, 434 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952); Reed & Prince Mfg. Co., ASBCA No. 3172, 59–1 B.C.A. par. 2172.

The Government also points to certain similarities between Mr. Dimond's legal services and those of Morris C. Solomon, the cost of which was disallowed by the Commissioner (see fn. 6, supra). The essential difference, however, is that Mr. Solomon's services were compensated by an annual retainer fee, which Acme was obliged to pay in any event, while Mr. Dimond was hired by plaintiff specifically for this case. The amounts owing to Mr. Dimond would not otherwise have been incurred.

The defendant also argues that, if legal expenses are awarded in this case, the Government will feel compelled to restrict settlement negotiations after an appeal to the Board, in order to avoid liability for such expenses. By the same reasoning, however, the contracting officer would be reluctant to negotiate a settlement, because legal costs incurred in that context are clearly reimbursable under the contract. Yet efforts at compromise on this level are a common occurrence.

by the contracting officer was confirmed by the Board on the basis of testimony at the appeal hearing by a Government auditor experienced in termination claims that this was a reasonable charge for accounting services. The only rebuttal witness called by Acme was a member of its accounting firm, who testified that the amount actually charged was fair and reasonable. In this court, plaintiff makes an additional argument in the form of an unsupported allegation that the accounting services for which it seeks reimbursement covered an interval considerably longer than the 44-day period on which the Board based its determination. What we have is a factual decision by the Board based on its acceptance of the testimony of one apparently qualified expert witness over another. On this record, we cannot agree with the Trial Commissioner's conclusion that the Board's determination was arbitrary, capricious, and not supported by substantial evidence. See Carlo Bianchi & Co. v. United States, Ct.Cl., No. 466–54, decided July 17, 1964, slip op., pp. 5–6. Plaintiff's recovery for post-termination accounting expenses is limited to $3,300, the amount awarded by the Board.[9]

*Covenant Against Contingent Fees.*— The final item in dispute on the Acme claim is the Government's deduction of $5,907.56 for violation of the contract's covenant against contingent fees. In the latter part of 1952 Acme became interested in entering the government contract field in order to provide a cushion against the sales fluctuations of its commercial business. Harry K. Tucker, Jr., was introduced to officials of the plaintiff as a person experienced in government procurement procedures. It was suggested that Acme establish a separate division to handle government contracts in the metals field, with Tucker con-

tributing his sales ability, and his associate, James S. Norris, serving as general manager of the new operation. To this end Tucker entered into a one-year contract with Acme on October 13, 1952, whereby he and/or his new "organization" agreed to serve as a "bona fide sales agent" on a part-time basis and be paid initially a weekly minimum salary of $150. However, starting 45 days after the initial delivery date of contracts procured by him for Acme, Tucker's compensation was to be increased to five per cent of his weekly gross sales up to $10,000 (*i. e.*, sales under contracts procured through him), plus three per cent of such weekly gross sales in excess of $10,000. Minimum salaries paid prior to any sales by Tucker were to be deducted, later, from the excess of his commissions over his minimum weekly guarantee. The net effect of the arrangement was that the guaranteed weekly salary was a non-recoverable advance against commissions; but the agreement did permit Acme to cancel the contract if commissions did not cover the minimum salary guarantee. The contract stated that Tucker had no special connections of any kind with government departments, and that he would continue to "represent other persons and firms having the same and dissimilar lines of business."

The nature and scope of Tucker's actual services are delineated in finding 17, and the findings of fact in Acme's companion suit against the Government (see notes 1 and 3, supra) present additional aspects of his performance, including graphic instances of perfidy to his employer. His affirmative services primarily involved the procurement and administration of plaintiff's two government contracts. Beginning in February 1953, he spent the major part of his time on Acme matters. On March 18, 1953, Tucker and Norris entered into a new

9. This case was tried, and the Commissioner's report filed before the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Neither party has preserved an objection to the receipt of *de novo* evidence, and we therefore need not concern ourself with that problem. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963), and succeeding decisions in the same line.

agreement with Acme, under which they were engaged on a full-time basis starting March 2, 1953, at a weekly salary of $300 each. Instead of commissions, the revised contract also provided that Tucker and Norris would share in the profits from Acme's factory in Lansdale, Pennsylvania, which had been leased two months before to handle government contracts. Tucker's salary was reduced to $250 on October 11, 1953, and his services were terminated on November 11, 1953. Throughout his employment by Acme, Tucker was compensated on the basis of his weekly guarantee, whether or not it was considered as an advance against commissions or as a salary, and deductions were duly made from each such payment for social security and withholding taxes.

In its termination claim, Acme requested $5,907.56, the amount it had paid Tucker for his services. The contracting officer disallowed that portion of the claim as a contingent fee precluded by the contract, and this decision was affirmed by the Board.

Under the Armed Services Procurement Act of 1947, 62 Stat. 21, 23, 10 U.S.C. § 2306(b), defense contracts such as this are required to contain a warranty "that the contractor has employed or retained no person or selling agency to solicit or obtain the contract under an understanding or agreement for a commission, percentage, brokerage, or contingent fee, except a bona fide employee or established commercial or selling agency maintained by him to obtain business." The statute also provides that "[i]f a contractor breaks such a warranty the United States may annul the contract without liability or may deduct the commission * * * from the contract price or consideration." As one of its standard clauses, the present contract (as well as its companion in No. 349–57) included both the prescribed covenant and the statutory remedies given the Government in the event of breach.

The policy underlying the statutory prohibition of contingent fees is deeply rooted. In Providence Tool Co. v. Norris, 69 U.S. (2 Wall.) 45, 54, 56, 17 L.Ed. 868 (1864), the Supreme Court refused to enforce an "agreement for compensation to procure a contract from the Government," stating unequivocally that such agreements "are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country." Though the uncompromising rule stated in the Norris case has been tempered in the intervening years (e. g., Oscanyan v. Arms Co., 103 U.S. 261, 273–275, 26 L. Ed. 539 (1880)), its basic rationale was accepted and elaborated by Mr. Justice Holmes, speaking for a unanimous court: "The court will not inquire what was done. If that should be improper it probably would be hidden and would not appear. In its inception the offer [involving the sale of land to the Government], however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward." Hazelton v. Sheckells, 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939 (1906) (citation omitted.) The Court has very recently approved Hazelton. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 550 n. 14, 81 S.Ct. 294, 5 L.Ed. 2d 268 (1961).

In the light of this continuing policy, we must decide whether the statutory exception for a "bona fide employee or established commercial or selling agency maintained by [the contractor] to obtain business" permits recovery in this case. An important reason for the exception was that a small businessman may be compelled to hire a knowledgeable sales agency on a part-time basis if he is to survive in the complex business of government contracting. At the same time, the specter of the "influence peddler" has continued to shadow the realm of federal procurement. See, generally, The 5-Percenter Investigation, S.Rep. No.1232, 81st Cong., 2d Sess. (1950).

As a result, most courts construing the covenant, including this court, have accepted the underlying premise of the Supreme Court—that the mere absence of proof of improper influence is insufficient to establish a bona fide relationship. See, e. g., Eglin Manor, Inc. v. United States, 279 F.2d 268, 273–274, 150 Ct.Cl. 143, 152–153 (1960); Le John Mfg. Co. v. Webb, 95 U.S.App.D.C. 358, 222 F.2d 48, 51 (1955).[10] Such proof is seldom forthcoming unless one of the guilty parties confesses. Going considerably further, some courts have intimated that employment by the contractor of a part-time agency to obtain government contracts, with remuneration based solely on commissions, is enough to violate the covenant. See Mitchell v. Flintkote Co., 185 F.2d 1008, 1009 (C.A.2, 1951); United States v. Paddock, 178 F.2d 394, 395–396 (C.A.5, 1949), rehearing denied, 180 F.2d 121, cert. denied, 340 U.S. 813, 71 S.Ct. 41, 95 L.Ed. 597 (1950). Most tribunals, however, have eschewed any sort of *per se* rule. To ascertain whether a contingent fee arrangement might tend to "induce improper solicitations," these courts have chosen to scrutinize the totality of circumstances surrounding the challenged relationship.[11] Of particular concern has been the nature of the agency relationship, *i. e.*, whether the arrangement has continuity, whether the agency itself is an established firm or if a new firm other than fly-by-night, and whether the agents involved have adequate knowledge of the principal's product line. Likewise significant is the character of the service rendered; an agency hired to obtain specific government contracts is less likely to be held bona fide than one employed to drum up government and commercial business generally; whether the agency is hired on a full- or part-time basis is also a factor. Finally, these courts and boards have examined the reasonableness of the fee and have noted whether payment is wholly or partially contingent on success in obtaining government contracts. Though incapable of precise measurement, all these facets have been considered and weighed in determining if a challenged agency arrangement is bona fide within the meaning of the statute.

We assume, without deciding, that the stricter standard is inapplicable to this case and that the Acme-Tucker arrangement should be evaluated under the broader criteria just described. Judged by those principles, plaintiff has failed to sustain its burden of showing (see Le John Mfg. Co. v. Webb, supra, 222 F.2d at 51) that the relationship was bona fide in that sense.[12] The Tucker-Norris "organization" was newly created, and without outward signs of permanence or long-range goals. Far from comprising an established concern, Tucker and his associate, Norris, seem to have first combined forces in dealing with this plaintiff. Previously, the extensive contingent fee activities of Tucker and

---

10. Executive Order 9001, 6 Fed.Reg. 6787, issued in 1941, required the inclusion of such covenants in all defense contracts. But variations of the present covenant against contingent fees have been included as standard clauses in various government contracts since World War I. See Barron and Munves, The Government Versus the Five-Percenters: Analysis of Regulations Governing Contingent Fees in Government Contracts, 25 Geo. Wash.L.Rev. 127 (1957). The covenant has been interpreted most frequently in actions by agents to recover commissions for procurement of government contracts; one of the defenses asserted is that a contingent agreement is unenforceable because it violates public policy. E.g. Browne v. R & R Eng'r Co., 264 F.2d 219 (C.A.3, 1959); Mitchell v. Flintkote Co., 185 F.2d 1008 (C.A.2, 1951).

11. Although not directly applicable (since they became effective after the present contract was executed), ASPR §§ 1.505, 1.506, 32 C.F.R. 1.505, 1.506, offer helpful guidelines for evaluating the character of a contingent fee arrangement; these regulations adopt, in effect, the position that all the circumstances are to be considered.

12. The issue of whether or not the relationship was bonafide, as that term is used in the covenant, presents ultimately a question of law on which the Board's conclusion is not binding. The Board appears to have decided the issue as one of law (see finding 17(i) (3)).

his father had precipitated an investigation by the General Accounting Office. See finding 17(b). In addition, the group's agency for Acme clearly lacked stability. When plaintiff originally hired Tucker on a part-time basis, it did not bother to ascertain who his other clients were, much less to ask them about the type and quality of services he rendered, as would be customary if a long-term arrangement were contemplated. Although Tucker's contract with Acme was for a one-year period, it could be canceled, on mere notice, for failure to secure sufficient business. There is no evidence that Tucker had even a rudimentary understanding of Acme's line of business, which was principally the manufacture of processing tanks, boilers, containers, and similar items for the distillery, brewery and sugar industries. The only contracts obtained by the plaintiff through Tucker were for the manufacture of equipment not even remotely related to Acme's traditional product line. Even if one accepts the explanation that Acme wished to enter new product lines, it does not excuse the absence of evidence that Tucker knew anything about Acme's potential ability to carry out the contracts it entered with the Government. There is, in fact, considerable evidence suggesting the contrary. For instance, in its contract for the manufacture of 2,322 recoil-less rifles, Acme's original bid target price was $337 per rifle. Its actual unit cost for the manufacture of the first 446 rifles delivered under the contract turned out to be $1,179. Acme Process Equipment Co. v. United States, Ct.Cl., No. 349–57, 347 F.2d 509, decided this day, findings 7, 52 (a). Under the present contract, deliveries were to be completed by October, 1953; when the United States terminated the contract for its convenience in March 1954, no deliveries had yet been made. Findings 2, 3. We infer that, with respect to Acme, Tucker was considerably less than an established sales agent with a good understanding of his client's products and potential.

The nature of the services rendered by the Tucker "organization" does little to dispel our doubts. For the first four months of his employment, Tucker was a part-time sales agent whose other clients were unknown to Acme. Although there is some evidence that he elicited inquiries from non-governmental business sources, the only contracts Tucker actually obtained for Acme were with the defendant. While the agency agreement described various services to be rendered by Tucker in addition to his primary responsibility of obtaining government contracts, failure to perform any of these supplementary duties was explicitly eliminated as a basis for cancellation. Those duties which were unrelated to sales may have originally been no more than window-dressing in the contract. Once Acme began to perform, Tucker did appear to render substantial services in the administration of the government contracts. But it is difficult to determine what proportion of that time was spent in defrauding Acme by the arrangement of subcontracts under which Tucker was secretly to receive illegal kickbacks. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 49–57, 347 F.2d 509, decided this day, findings 22–25. Nor did plaintiff offer any proof that Tucker's contingent compensation was reasonable in relation to his useful services.

To establish that Tucker was a bona fide sales agent (and later a bona fide employee), plaintiff has shown only that, at the outset, he apparently attempted to drum up some commercial business; and that he assisted in the administration of the government contracts which Acme obtained. Plaintiff then rests on the Government's failure to prove that improper influence was exerted in procuring the contracts. Against this we must balance the instability of the Acme-Tucker relationship and of the Tucker "organization" itself; the failure to prove that Tucker knew anything about Acme's traditional product line or its capacity to perform gov-

ernment contracts in the unrelated areas it sought to enter; the failure to prove that Tucker's compensation was reasonable; and the questionable character of the non-selling services Tucker rendered.[13] We bear in mind that "[t]he exception [for bona fide agents] creates a privileged class who may receive contingent fees for securing government contracts, while others may not. * * [Such] grants of special privileges [should] be jealously restricted * * ." Bradley v. American Radiator & Standard Sanitary Corp., 159 F.2d 39, 40–41 (C.A.2, 1947); Le John Mfg. Co. v. Webb, supra, 222 F.2d at 50. Assessing all the elements which must be considered in making such a determination, we conclude that the Tucker-Norris "organization" has not been shown to be a bona fide established commercial or selling agency maintained by Acme for the purpose of securing business, and therefore that Acme violated the covenant against contingent fees when it entered into the contract.

Plaintiff argues that, even if it did violate the covenant, the Government acquiesced in the relationship with Tucker and is therefore equitably estopped from asserting a violation. In its bid for the present contract, filed November 4, 1952, Acme filled in the appropriate blank spaces on the first page, representing "that [the contractor] has employed or retained a company or person (other than a full-time employee) (working solely for the bidder) to solicit or secure this contract, and agrees to furnish information relating thereto as requested by the Contracting Officer." On December 12, 1952, Acme furnished the defendant with a Form 119, entitled "Contractor's Statement of Contingent or Other Fees", to which was attached a copy of its employment contract with Tucker. On May 18, 1953, Acme (per Norris) advised the defendant in writing that Tucker had become a full-time sales manager for the company's Lansdale operation as of January 1953, that his original contract calling for compensation of part-time services on a commission basis was canceled, and that Tucker had never collected any commissions on contract work obtained for Acme. Although Norris stated that Tucker's new basis of employment dated back to January rather than March (the true date), at least the defendant had notice as of May 18, 1953, that Tucker's original contract had been superseded by a new one. Resting on these representations, plaintiff asserts that defendant was fully apprised of the Tucker-Acme agency relationship—and that its failure to protest until after the termination of the contract in March 1954 prevents the Government from doing so now.

▇▇▇▇▇ Assuming that the Government had complete knowledge of the contingent fee arrangement in 1953, its failure to object until after the termination of the contract would not prevent it from defending against reimbursement of payments made in violation of the covenant. This problem is very different from the effect of delay on the Government's right to elect the drastic remedy of annulling the contract entirely (without cost) because of the breach of the covenant. We deal with that subject in No. 349–57. Here we are concerned only with the impact of delay on the defendant's right to deduct the improper commissions from the contract price or consideration—the lesser remedy given for breach of the covenant by the Armed Services Procurement Act and the contract article. The well-established doctrine has it that "[t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. * * * Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time." United States v. Wurts, 303 U.S. 414, 415–416, 58 S.Ct.

---

13. We do not intend to imply that subsequent improper secret dealings by an agent will invalidate an arrangement that was bona fide in its inception. It is appropriate, however, to consider such activities in connection with a claim that the agent performed legitimate services unrelated to sales.

637, 638, 82 L.Ed. 932 (1938) (footnotes omitted). See, also Grand Trunk Western Ry. v. United States, 252 U.S. 112, 121, 40 S.Ct. 309, 64 L.Ed. 484 (1920). The same principle has been applied in an action to regain funds paid in violation of the covenant against contingent fees. See United States v. Paddock, supra, 178 F.2d 394, 396–399 (C.A.5, 1949), rehearing denied, 180 F.2d 121, cert. denied, 340 U.S. 813, 71 S.Ct. 41 (1950). In an analogous area, where employers have failed to make payments required by certain minimum wage laws, the right of the United States to recover the amount of the underpayments or liquidated damages is time-barred only by express Congressional action in the form of a two-year statute of limitations. 61 Stat. 87, 29 U.S.C. § 255; e. g., Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 73 S.Ct. 580, 97 L.Ed. 821 (1953) (Walsh-Healey Act). In a still more closely related field, there is no time-bar in actions by the Government to retrieve illegal kickbacks. See United States v. Davio, 136 F.Supp. 423, 426 (E.D.Mich., 1955).

 The long succession of cases refusing to apply the statute of limitations against the United States rests on the principle "which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." United States v. Nashville, Chattanooga & St.

Louis Ry., 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886). For the same reason, the equitable principles of laches and estoppel have generally been rejected as defenses to actions by the United States for the recovery of property or funds to which it is legally entitled. See Guaranty Trust Co. v. United States, 304 U.S. 126, 132–133, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); United States v. Insley, 130 U.S. 263, 265–266, 9 S.Ct. 485, 32 L. Ed. 968 (1889); American Surety Co. v. United States, 112 F.2d 903, 906 (C.A. 10, 1940). The mere fact that, in form, the present case involves money withheld by the United States, rather than disbursed funds which it is seeking to recover, in no way modifies the pertinence of the rule.[14] The principle is that, except where Congress has otherwise provided, the passage of time does not diminish the Government's right to monies which it is illegal to pay out.

 Accordingly, unless the United States validly waives a right to withhold or recover such funds to which it is entitled,[15] its right is barred neither by lapse of time nor by the other party's change of position.[16] Waiver of the right to such sums should not be easily implied where the contractual provision, like this one, is based on a statutory requirement embodying a strong national policy. In the present case the defendant's mere acceptance of a form to which Tucker's employment contract was at-

14. A contrary rule could easily be circumvented. By simply disbursing the contested funds, the Government could then bring an action for their recovery.

15. An agent who attempts to waive the Government's rights must have the authority to do so, and there are certain rights of the United States which its officials may not validly waive. Cf. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 561, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) and the discussion of that case in Acme Process Equipment Co. v. United States, Ct.Cl., No. 349–57, 347 F.2d 538 decided this day. But,

16. The cases cited by plaintiff in support of its estoppel point are inapposite. Companhia Atlantica v. United States,

180 F.Supp. 342, 148 Ct.Cl. 71, cert. denied, 364 U.S. 862, 81 S.Ct. 103, 5 L. Ed.2d 85 (1960), involved cancellation of the entire contract for a purported violation of the covenant against contingent fees, rather than refusal to reimburse only the amounts of illegal fees. In any event, the court found that the covenant had not been violated. The significance of the Atlantica case is discussed in greater detail in the companion case, No. 349–57, also decided this day. Harvey Radio Laboratories, Inc. v. United States, 115 F.Supp. 444, 449, 126 Ct.Cl. 383, 391–392 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954), dealt with the doctrine of equitable estoppel as it applied to the contractor rather than the Government.

tached, and of another similar communication, can hardly be construed as a clear waiver of its normal right to refuse to countenance illegal payments. The Government did not tell Acme that the latter's relationship with Tucker was legal or approved. All the Government did was silently to receive certain information and fail to make inquiry or to take action for some time. Passivity of this type does not amount to the necessary affirmative waiver where the right is not the drastic one to cancel the contract as a whole but the conventional immunity from illegal payments. Plaintiff has directed our attention to 44 C.F.R. § 150.11 (c), but that regulation simply states the avenues of relief available to the defendant in the event of a misrepresentation or a violation of the covenant. It does not require action by the Government immediately after a contingent fee agreement is submitted, nor does it require a binding advance determination as to the legality of the arrangement. As has been noted, an examination of all the surrounding circumstances may be necessary to ascertain if the arrangement is legal. Submission of the agency contract offers no magic key, opening all doors at once. A deeper inquiry may well be needed, and the actual manner of carrying out the agency arrangement can be important. For these reasons, we conclude that the defendant is not estopped from refusing to reimburse Acme for the amounts it paid Tucker in violation of the covenant against contingent fees. Plaintiff is not entitled to recover such amounts.[17]

On Acme's claim for itself, the Board was in error only in disallowing the $3,500 post-termination legal expense paid to Mr. Dimond. Added to the $21,518,73 found by the Board to be due, Acme is entitled to $25,018.73 on its termination claim.

## THE ALL METALS CLAIM AND THE DEFENDANT'S COUNTERCLAIM

By virtue of amendments to the petition, plaintiff is now claiming $49,720.02 on behalf of All Metals, in addition to the amount allowed by the Board in its final decision. The excess includes claims based on settlement expenses and profits. All Metals has also requested the court to disallow a deduction taken by the Board for loss on the completed portion of the subcontract.

A complete defense asserted by the Government makes consideration of these individual claims unnecessary. Tucker was a hidden double agent, acting for both Acme and All Metals and obtaining a commission from the latter for procuring the subcontract with Acme. When Acme entered into its agreement with All Metals, it was wholly unaware that Tucker was secretly serving as All Metals' agent. On the other hand, at the time Tucker was soliciting business on its behalf from Acme, All Metals knew that he was also an Acme employee. See finding 20(a). The resulting agreement thus falls within the common law principle that, "If a party enters into a contract through an agent who is also secretly acting for the other party, the contract is not only unenforceable specifically against the principal, but, unless ratified, is subject to a defense in any court on the ground of at least constructive fraud if the other party knew of the double employment * * *." 5 Williston, Contracts § 1532 (rev. ed. 1937) (citations omitted).[18] When the Government ter-

---

17. The defendant also asserts that certain alleged misrepresentations made by Acme concerning its contingent fee arrangements render the entire contract unenforceable. The same argument is discussed at length in the companion case, No. 349–57, and rejected. For the reasons given there, we likewise reject the Government's identical contention in this action.

18. The defendant does not assert that the Anti-Kickback Act, 74 Stat. 740, 41 U.S.C. § 51, is applicable to the present transaction. Enactment of the anti-kickback legislation, however, in no way altered pre-existing common law remedies. See United States v. Davio, 136 F.Supp. 423, 427–428 (E.D.Mich., 1955).

minated its contract with plaintiff in March 1954, plaintiff's responsible officials [19] did not know, though they may have had some suspicion, of Tucker's secret agency arrangement with All Metals. Finding 20(b).[20] Since full knowledge of all material facts is a prerequisite to ratification (e. g., Emco Mills, Inc. v. Isbrandtsen Co., 210 F.2d 319, 324 (C.A. 8, 1954); Holland Furnace Co. v. Allen, 118 F.2d 969, 972 (C.A.6, 1941)), Acme could not have ratified the subcontract with All Metals until after the termination of its prime contract with the Government. Nor did Acme try to ratify the subcontract before termination.

■■■ As a result, we are faced with an anomaly. Subsequent to the ending of its prime contract, Acme has attempted to ratify in its entirety the previously voidable agreement with All Metals. In the event of a termination for convenience, however, the subcontract specifically restricted Acme's liability to All Metals to any amounts awarded the subcontractor by the defendant.[21] The effect, then, of Acme's purported post-termination ratification is that, long after the conclusion of All Metals' performance under the subcontract, Acme has become willing to affirm that voidable agreement at the expense of the Government—and without incurring any costs or ultimate liability itself. Ratification has no other consequence than to saddle the defendant, not Acme, with the costs of All Metals' voidable subcontract; Acme gains nothing from the ratification and All Metals gains everything. We refuse to sanction such a ratification, *post litem motam*, for the benefit of All Metals alone; it violates the doctrine that "affirmance is * * * inoperative as ratification * * * as against persons who in the meantime have acquired interests with which it would be unjust to interfere." 2 Williston, Contracts § 278A n. 1, (3d ed. 1959). See also, Restatement, Agency 2d, § 101(c) (1958). After termination of the prime contract, the Government necessarily become the only party that could be held responsible to All Metals. If Acme had taken the reasonable step of avoiding the subcontract after discovering the facts as to Tucker's fraudulent double agency in 1956, the defendant would have been free from liability.[22] After the ending of the prime contract, when Acme could no longer possibly derive any benefit from ratification of the subcontract, the Government surely "acquired interests with which it would be unjust to interfere." Acme may not destroy such interests by creating a claim on behalf of All Metals against the defendant through an after-the-fact ratification for the sole advantage of the wrongdoer.

■■■ All Metals raises several points in response. It first contends that the

---

19. Not counting, of course, Tucker and his fellow conspirators in the plan to defraud Acme.

20. Sidney Cohen, the secretary of the corporation and the only Acme official to testify at the trial, stated: "It is very difficult to pinpoint the exact time, but I think the time that I gathered the knowledge that Tucker was performing for All Metals, I believe, was at the court hearing in Judge Clary's court in Philadelphia." Tr. 11. (This is a reference to the 1956 trial of Tucker, Norris, and Jack Epstein for violations of the Anti-Kickback Act in connection with Acme's other major government contract. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 349–57, 347 F.2d 509, decided this day, finding 31.) See, also, Tr. 1610–11 of the companion case.

21. Provision 12 of the subcontract stipulated that, in the event of a termination by the defendant of the prime contract, Acme "shall be under no liability [to All Metals] * * * until it receives from the Government approval and allowance of [All Metals'] claim * * *." See finding 19(a).

22. A party seeking to avoid an agreement for fraud must first offer to restore any consideration received from the other party, or its reasonable value. In the present case, however, All Metals' deliveries under the subcontract were minimal, and its compensation considerably exceeded their reasonable value. See text accompanying fn. 24, infra.

Government is estopped because it waited until 1961 to assert this defense, although contract performance took place in 1953 and 1954. For this delay to operate as an estoppel, All Metals would at least have to show detrimental reliance resulting from the defendant's inaction. But the defense could not have been raised until after the convenience termination, because the Government was not fully aware of Tucker's double agency and the related kickbacks until April 1954 (see Acme Process Equipment Co. v. United States, Ct.Cl., No. 349–57, 347 F.2d 509, decided this day, finding 49), and Acme apparently did not discover the fraudulent activities until still later (see fn. 20, supra). Since both the prime contract and the All Metals' subcontract were canceled in March 1954, the subcontractor could not possibly have continued performance in reliance upon any delay by the Government in raising this defense. The delay-after-termination did not harm All Metals.[23] The estoppel argument must therefore be rejected because the subcontractor incurred no injury as a result of the Government's tardiness in asserting that the subcontract was voidable.

▋ Plaintiff next points out that the prime contract was a fixed-price agreement. Had the contract been completed, it is argued, the Government would not have been victimized. It was only when the defendant terminated the contract with Acme for its own convenience that it became obliged to reimburse All Metals. That being the case, plaintiff contends, any additional expense which the Government must bear is of its own making. The argument has two defects. The first is that Acme, not the defendant, would be responsible for casting the All Metals termination costs on the Govern-

ment. Subsequent to the termination, Acme attempted to ratify its entire subcontract with All Metals in a transparent effort to make the Government alone bear costs for which it would otherwise have had no obligation. Without Acme's purported ratification, neither Acme nor the Government would have been liable. Second, plaintiff is in effect suggesting that the Government, by validly exercising its right to terminate the contract for convenience, has incurred self-inflicted damages; the defendant cannot be penalized for invoking a right specifically conferred by the contract.

▋ Finally, it is suggested that, even if Acme could have avoided its agreement with All Metals after termination of the prime contract, rescission of the subcontract would not have completely freed Acme from liability. If Acme attempted to rescind the transaction, it would have had to compensate All Metals for the reasonable value of any consideration Acme had actually received.[24] See Restatement, Restitution § 65(e). Assuming that the Government would, by the same token, be liable to All Metals for the value of its deliveries to Acme, we find that the subcontractor has already been paid considerably more than that amount. When its contract was canceled in March 1954, All Metals had delivered only a small percentage of the components called for in the agreement. In April 1958, however, the defendant made a partial payment of $50,040.28 for the use of All Metals. The total subcontract price was $107,496, and the amount of that reimbursement far exceeded any *quantum meruit* recovery to which All Metals might have been entitled. Since All Metals has been paid more than the actual value of its services, it is entitled

23. The time lapse was not as great as plaintiff implies. The Government's first opportunity to raise such a legal defense, formally, was on appeal to the Board. As a result of protracted settlement efforts, the defendant did not file its answer in the Board proceedings until

1958. The period of actual delay in asserting the defense was thus from 1958 to 1961.

24. The purpose of this requirement is "to prevent enrichment by the rescinding party at the expense of the other." Restatement, Restitution § 65, Comment "e".

to no further recovery, and its claim must be dismissed.[25]

On the other hand, the defendant has asserted a counterclaim seeking return of the partial payment of $50,040.28 it made for the benefit of All Metals in 1958. At the time this amount was credited to All Metals, both Acme and the Government were fully aware of Tucker's double agency arrangement (see fn. 20, supra). In accepting the partial payment designated for All Metals, Acme, with the concurrence of the defendant, affirmed its liability under the subcontract to that extent. The payment to All Metals was not tainted by any illegality, since there is no barrier to affirmance of a voidable contract and there was no statutory or contractual bar to paying All Metals. *E. g.*, Brown v. Alkire, 295 F.2d 411, 415 (C.A.10, 1961); Courtney v. Custer County Bank, 198 F.2d 828, 830–831 (C.A.9, 1952). We think that the partial reimbursement in 1958 constituted pro tanto ratification by both Acme and the defendant, with full knowledge, of the previously voidable subcontract.[26] To permit the defendant to turn its back on that completed transaction at this late date would impose an altogether unjust burden on Acme to recover the payment in dispute from All Metals.

The counterclaim differs in significant respects from the affirmative claims which Acme is making on behalf of the subcontractor. In the latter Acme is unilaterally attempting by its own post-termination act of ratification to throw upon the defendant a financial burden which neither Acme nor the defendant would otherwise have—and Acme is doing this solely in order to help the wrongdoing All Metals. In the counterclaim the defendant is now seeking to withdraw from a partial ratification in which it joined with full knowledge of the facts; and in rejecting that partial ratification through this counterclaim the defendant is seeking to collect the money from Acme, which did not retain the distribution but passed it on to All Metals (as was intended). Acme would thus be left to recover as best it can from All Metals. It is as unfair for the Government now to disaffirm a partial ratification (in which it joined) after Acme has changed its position as it is for Acme to seek a further unilateral ratification of the subcontract, post-termination, to the sole disadvantage of the Government.

Our decision that the defendant partially ratified the subcontract when it made payment in 1958 for All Metals' benefit results at most in only a technical breach of the rule that a transaction must be ratified in its entirety. The underlying reason for the rule against piecemeal ratification is that "the purported principal must take the transaction in its entirety, with the burdens as well as the benefits." Restatement, Agency 2d, § 96, Comment "a". By its ratification of the subcontract to the extent of the Government's payment, Acme did not seek to evade its responsibilities; the only responsibility which Acme had at that point was to pass on any payments made by the defendant for

25. Plaintiff emphasizes that All Metals assigned the proceeds of the subcontract to the Pittsburgh National Bank at the outset of performance, and, at that time, Acme waived its right of set-off "except for claims arising under the contract". However, we are dealing with such a claim in this instance.

Since we deny relief to All Metals on the ground previously discussed, it is unnecessary to consider the Government's defense based on the "Severin" doctrine. See Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944).

26. Although the presence of an exculpatory clause in a subcontract may sometimes bar the prime from suing the Government on behalf of the subcontractor (See J. L. Simmons Co. v. United States, 304 F.2d 886, 158 Ct.Cl. 393 (1962)), it does not prevent the United States from entering into a negotiated settlement with the subcontractor after a convenience termination. See, generally, Armed Services Procurement Regulations §§ 8–207, 8–208; Paul, United States Government Contracts and Subcontracts 516 (1964).

the benefit of All Metals. The present situation is analogous to those falling within the rule that, "If the purported principal attempts to ratify in part, as where he offers to pay less than the contract price for goods purchased in his name, he may be bound upon a contract if this offer is accepted by the other party. This is not because of ratification, however, but because he has become a party to a new contract." Restatement, Agency 2d, § 96, Comment "d". Accordingly, the Government is not entitled to recover from Acme the $50,040.28 it deliberately paid for the benefit of All Metals at a time when all parties had full knowledge of the material facts. Its counterclaim is denied.

The claim asserted by Acme on behalf of All Metals and the related counterclaim raised by the defendant are dismissed. Acme is entitled to recover $25,018.73 on its own claim, and judgment is entered to that effect.