347 F.2d 509
 ACME PROCESS EQUIPMENT CO., to its own Use, and for the Use and Benefit of Nicholson Products Company, Steel Heddle Manufacturing Co., Foley Machine Company, Pattern Machine & Foundry Corporation, Intricate Manufacturing Company, Jaimie Kohan, d/b/a Manalapan Machine & Welding Works, and Pittsburgh National Bank, Successor to People's First National Bank & Trust Company, Assignee of All Metals Industries, Inc.
v.
The UNITED STATES.
 No. 349-57.
 United States Court of Claims.
 June 11, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jack Rephan, Washington, D. C., for plaintiff. Solomon Dimond, Washington, D. C., George E. Palmer, Ann Arbor, Mich., Danzansky & Dickey, Washington, D. C., of counsel.
 James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.
 DAVIS, Judge:[1]
 
 
 1
 Plaintiff's first experience as a defense contractor was to bid on and win two negotiated Ordnance Corps contracts, both of which soured into litigation.[2] In January 1953, Army Ordnance awarded a contract for the manufacture of 75 mm. recoilless rifles. This project was largely subcontracted, leaving for Acme only the final finishing and assembly of components, and the earlier job of fashioning the rifle barrels from rough forgings with machines furnished by the Government under a separate facilities contract. From the start, Acme was beset by serious production delays due to a combination of causes, among them its own inexperience, defaults by subcontractors, and defects in some of the government-furnished machines. Generous time extensions forgave many delinquent deliveries, but liquidated damages were assessed on others. After uncovering alleged violations of statutes relating to kickbacks, contingent fees, and conflicts of interest, Ordnance suspended work under the contract in July 1954 and canceled it two months later in August 1954. The purported infractions involved a clique of unprincipled employees of Acme, aligned with a stockholding minor executive of the corporation. In this suit for breach of contract Acme denies any violations and alleges that the charges of malfeasance were a smokescreen to enable the Government to cancel without cost a contract for the production of obsolete weapons no longer needed. In that manner, it is said, defendant hoped to avoid the heavy cost of a termination for its own convenience. Cancellation left Acme financially crippled, since it was unreimbursed for much of its large investment in contract performance. Plaintiff spent years in fruitless but nearly successful efforts to obtain settlement.
 
 
 2
 The Government's major defense still is that Acme is entitled to no recovery because it violated certain statutes and covenants (concerning contingent fees, kickbacks, false claims, and conflicts of interest). Should each of these absolute defenses be rejected, the plaintiff has requested us to grant recovery based on the theory of restitution, rather than the traditional remedy of damages usually awarded by this court. In addition to its objection to this form of relief, the Government asserts a partial defense based on plaintiff's lack of standing to sue on behalf of its subcontractors. The defendant also argues that, since plaintiff itself was responsible for delays, it is not entitled to recover delay-damages, and the contracting officer's assessment of liquidated damages was proper. Finally, Acme urges its right to interest on amounts due, on the ground that the Government's actions constituted a taking within the Fifth Amendment. We consider each of these aspects of the case.[3]
 
 I. CANCELLATION
 A. COVENANT AGAINST CONTINGENT FEES
 
 3
 The defendant contends that it validly canceled the contract in the summer of 1954 because (1) Acme misrepresented and concealed its employment of a part-time agent to secure government contracts; and (2) such an arrangement violated the covenant against contingent fees.
 
 
 4
 For many years prior to the events with which we are concerned, Acme enjoyed some prestige as a manufacturer of processing tanks, boilers, containers, and related equipment for the distillery, brewery, and sugar industries — a predominantly civilian market. In 1952 it sought to enter the field of government procurement to provide a cushion against the fluctuations of its commercial sales, particularly in periods of war-born material shortages. Lacking expertise in this prospective market, plaintiff engaged, in the early fall of 1952, the services of Harry K. Tucker, Jr., and James S. Norris, who represented accurately that they were experienced in government procurement procedures, but concealed their dishonorable intentions to victimize their employer. At first, the team was paid under an informal arrangement providing for commissions on sales and a minimum salary guarantee. On October 13, 1952, Tucker entered into an express one-year contract with Acme, whereby he and/or his "organization" agreed to serve as a "bona fide sales agent" on a part-time basis.[4] Under the agreement, Tucker was to be paid a weekly minimum salary of $150, which would be increased to five percent of his weekly gross sales up to $10,000 (i. e., sales by Acme under contracts obtained through him), plus three percent of such weekly gross sales in excess of $10,000. Minimum salaries paid prior to any sales by Tucker were to be deducted, later, from the excess of his commissions over his minimum weekly guarantee. The result was that the guaranteed weekly salary was a nonrecoverable advance against commissions; Acme could, however, cancel the contract if commissions failed to cover the minimum salary guarantee. Norris and Tucker also entered into an agreement with each other that Norris would receive fifty percent of any fees paid Tucker by his other clients for enabling them to obtain subcontracts from Acme. Plaintiff was unaware of this latter arrangement.
 
 
 5
 Tucker shortly produced a deluge of inquiries, bid proposals, and invitations from both commercial and government sources. Among these were the invitations to bid on the contract at bar (Contract 1213), as well as the agreement (Contract 8580) which is the subject matter of the other suit, No. 538-59.
 
 
 6
 On October 23, 1952, Acme submitted its original bid for Contract 1213 to the Philadelphia Ordnance District. The bid form contained a provision requiring the contractor to represent whether it had or had not (boxes were supplied after each of the alternatives for inserting a mark to denote the correct fact) "employed or retained a company or person (other than a full time employee) to solicit or secure this contract." In its October 23rd bid, James S. Norris, as "General Manager of the Defense Work Department," certified that plaintiff had not retained such a person. Under a revised proposal, dated December 10, 1952, and also signed by Norris, plaintiff made a directly contrary representation. On December 18, 1952, however, Acme once again reversed its position. Joshua Epstein, president of Acme, executed a government form entitled "Contractor's Statement of Contingent or Other Fees", in which he, either accidentally or deliberately, filled in one of the two alternative boxes to indicate that Acme had not retained a part-time employee to secure the contract. This representation was incorrect, since plaintiff had, in early October, hired Tucker on a part-time basis to solicit government contracts.
 
 
 7
 We assume, for this part of the case, that these misrepresentations, or the substance of the Acme-Tucker contingent fee arrangement, or both, breached the contract. But the crucial point is that the defendant, after obtaining knowledge of the facts, waited until over a year later before canceling the agreement. Could an election to cancel be delayed for such a time? We hold not. In our view, an election to annul the contract had to be made with reasonable promptness after the Government gained knowledge of the facts; by putting off its decision for an inordinately long period, the defendant lost the right it earlier had to terminate the contract without incurring any cost.[5]
 
 
 8
 As early as May 1953, the Philadelphia Ordnance District had sufficient information to determine whether Acme had previously made any misrepresentations relating to contingent fees or had violated the covenant. In June 1953, defendant nevertheless issued a supplemental agreement, which increased the number of rifles to be manufactured under the contract from 2,322 to 2,751 (an 18% increment). Despite the production difficulties it encountered, plaintiff continued manufacturing the rifles until Ordnance directed it to suspend all work under the contract on July 22, 1954. Cancellation for unspecified "statutory violations" followed on August 18, 1954.
 
 
 9
 This phase of the case — as distinguished from the Government's responsibility to reimburse Acme for payments to Tucker in violation of the covenant against contingent fees — is governed by the rule that, "[W]here a contract is breached in the course of its performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on. If he chooses to continue performance he has doubtless lost his right to stop performance * * *." 5 Williston, Contracts § 683 (3d ed. 1961) (footnotes omitted); e. g., Lummus Co. v. Commonwealth Oil Refining Co., 280 F.2d 915, 929-930, 91 A.L.R.2d 912 (C.A. 1), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 5 L. Ed.2d 225 (1960); Lichter v. Goss, 232 F.2d 715, 720 (C.A. 7, 1956). After discovering the contingent-fee violations, defendant could not wait for over a year to decide whether it wished to annul the contract as a whole, on that basis. The sanction of contract cancellation is too drastic to permit a long delay. Beyond the time reasonably necessary to determine if there has been a misrepresentation or a violation of the covenant,[6] the defendant cannot allow an unwary contractor to continue performance and thus incur large expenses, all of which the Government will refuse to reimburse if and when it decides to cancel the contract on the ground of the violation. As this court said in Companhia Atlantica v. United States, 180 F.Supp. 342, 347, 148 Ct.Cl. 71, 78, cert. denied, 364 U.S. 862, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960), "it would be a great wrong to permit the Government to awaken such a `sleeper' to justify its cancellation * * *." In that case, the plaintiff had fully apprised the defendant of the contingent fee arrangement at the outset of negotiations, which lasted over a year. The Government then canceled its contract for the purchase of tungsten from the plaintiff less than two months after the agreement had been signed, and later sought to defend its action on the grounds that the covenant against contingent fees had been violated. Although the court found that there was no violation, it also based its decision on the alternative ground that the defendant had waited too long before annulling the contract. Here, too, we refuse "to awaken such a `sleeper'."
 
 
 10
 The severity of contract cancellation makes the present case, in this aspect, wholly unlike one in which the Government simply attempts to recover or withhold funds paid in violation of the covenant against contingent fees. That type of action is governed by the principle that, where government officials have erroneously or illegally paid out money, mere delay in seeking its recovery will not preclude a suit by the United States. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 538-59, 347 F.2d 538, decided this day. But when the Government cancels an entire contract because of a breach of the covenant, it can refuse to reimburse the contractor, not only for wrongful or illegal expenditures, but also for amounts to which the contractor would otherwise be legally entitled. To avert extreme hardship, we think that the Government is obliged to take such a course within a reasonable time after it has discovered the breach.[7]
 
 
 11
 The defendant does not seem to question that an unconscionable delay in raising a misrepresentation or a violation of the covenant against contingent fees as a ground for annulment will preclude the Government from thereafter urging that defense. It contends instead that there was no unreasonable delay, because the Government did not discover all the material facts until shortly before the actual cancellation. The evidence fails to bear out this argument.
 
 
 12
 In connection with its other major government contract ("8580"), Acme correctly represented, on November 4, 1952, in the bid which it submitted to Rock Island Arsenal that it had employed a part-time agent to obtain the contract. On or about December 12, 1952, Rock Island received from plaintiff a formal "Contractor's Statement of Contingent or Other Fees," to which was attached a copy of Acme's employment contract with Tucker dated October 13, 1952. Contract 8580 was awarded to plaintiff by Rock Island on January 8, 1953, but was administered by the Philadelphia Ordnance District, the same agency which handled present Contract 1213 from its inception. Thus, even prior to the award of Contract 1213 to Acme on January 27, 1953, the contracting Ordnance District had access to the Tucker employment agreement, which was physically incorporated in the Contract 8580 file, although the District had no particular reason to refer to that part of the file.[8]
 
 
 13
 On May 18, 1953, the Ordnance District was again told of the agreement between Acme and Tucker. Plaintiff informed representatives of the Ordnance District that Tucker had been a full-time employee since January 1953, that his original part-time contract on a commission basis had been ended, and that he had received no commissions under the prior agreement. The letter also referred to the contingent-fee statement previously filed with the Rock Island Arsenal and asked that it be withdrawn.[9] See finding 8(f). The defendant was thus told that (1) at the time that the plaintiff made its bid and negotiated for Contract 1213, it had in its employ a part-time agent whom it had hired to solicit government contracts; and (2) that agent was Harry K. Tucker, Jr., who, along with his father, had been under surveillance by the Government for suspected statutory violations in connection with prior contingent fee arrangements. Finding 3. Furthermore, by referring back to the bid and the related forms which Acme submitted to Ordnance in connection with Contract 1213 (and to which Acme specifically referred), the Philadelphia Ordnance District could easily have discovered the prior misrepresentations. Yet the defendant waited for fourteen months before canceling the contract. During this period the plaintiff continued to perform and to incur expense.
 
 
 14
 The Government seeks also to justify the delay on the ground that it was not told all the relevant facts until shortly before it canceled. It emphasizes an alleged informal agreement between Tucker and plaintiff's president, entered into when he first began working for Acme in the fall of 1952. Under that agreement, Tucker was to receive a three percent commission, which he agreed to share equally with Norris. But the only evidence in the record of this arrangement is a written statement made by a General Accounting Office investigator in June 1955, on the basis of an interview with Joshua Epstein, Acme's president. Even if we accept at full value this second-hand statement made three years after the events, there is no way of knowing whether the alleged informal agreement was superseded by Tucker's written contract. If that was the case — which it might well have been — this commission-splitting agreement lasted no more than two weeks. In this state of the proof we cannot give any significance to this alleged side-agreement. Other than the information referred to in footnote 9, supra, this is the only "fact" which the Government can point to as remaining undisclosed after May 1953. We do not hesitate, therefore, to conclude that the defendant had sufficiently full knowledge of the contingent-fee arrangement as of May 1953, and could not delay until July 1954 to elect on that ground to exercise the drastic remedy of complete cancellation.[10]
 
 B. ANTI-KICKBACK ACT
 
 15
 The Tucker organization victimized Acme chiefly through the receipt of illegal kickbacks. Unknown to plaintiff, various small manufacturers in the metals field had service contracts with Tucker similar to the one he had with Acme. Under those agreements, Tucker received a minimum weekly guarantee, as well as commissions for obtaining contracts. When plaintiff, through Tucker and Norris, let subcontracts to secret clients of the two conspirators, each subcontract necessarily contained an amount to cover the fee paid to Tucker and shared by Norris. Since the pair not only prepared Acme's government contract bids, but also negotiated all its related subcontracts, they were in a splendid position to mulct their employer.
 
 
 16
 The subcontract let to All Metal Industries, Inc. is the most flagrant example of the Tucker-Norris extortion scheme. More is involved than the secret commissions which the two received from All Metals for enabling it to secure subcontracts from the plaintiff. In addition, Tucker, Norris, and Jack Epstein, who was a plant superintendent and minor stockholder of Acme,[11] forced All Metals to agree to pay $23,500 to them through Gunn Engineering Company, a dummy corporation. It was understood that All Metals would pass this cost on to Acme by including it in the subcontract price. All Metals actually paid $12,000 to Gunn under the agreement. When the conspirators later became fearful of exposure, they attempted to expunge all evidence of the transaction from the subcontractor's books. Through an oversight, however, they left in the cost-structure of All Metals' ultimate subcontract price to Acme the $12,000 already paid to Gunn Engineering Company (although this sum was more than offset by Tucker's waiver of certain commissions which All Metals owed him). Even after All Metals decreased its ultimate price to less than that contemplated prior to the extortion scheme, the reduced price still reflected some portion of the combined fees which All Metals had paid or agreed to pay to Tucker and Gunn. Book keeping technicalities tend to obscure this fact, but, in the final analysis, had Contract 1213 been of a cost-reimbursable nature, the Government would ultimately have borne part of the cost of the kick-backs. See findings 20 and 21.
 
 
 17
 The arrangements between Tucker and other firms for which he obtained subcontracts from Acme were less complex, but hardly less reprehensible. For instance, Manalapan hired Tucker in November 1952 and agreed to pay him $100 weekly as a nonrecoverable advance against commissions. As a result, Manalapan obtained a series of small purchase orders from Acme under Contract 1213 from February through July 1953. The subcontract prices hid the $1,350 in commissions and/or salaries which Manalapan paid Tucker and which Tucker shared with Norris. The conspirators entered into comparable agreements with several other subcontractors. See findings 18-25. These subcontractors knew or should have known that Tucker was Acme's agent, but the responsible officials of Acme were not aware of the double agency.[12]
 
 
 18
 In these circumstances, the defendant claims that Acme violated the Anti-Kickback Act, 60 Stat. 37, as amended, 41 U.S.C. § 51, and that that violation authorized the Government to cancel the contract. The Anti-Kickback Act, first enacted in 1946, was significantly amended in 1960. 74 Stat. 740. Both versions retroactively prohibit the payment of any compensation or gratuity by a subcontractor to an agent, employer, or official of a higher tier subcontractor or a prime contractor with the United States. By the terms of the statute, such compensation is conclusively presumed to be included in the price ultimately paid by the Government, and the United States may bring a civil action against the prime contractor, subcontractor, or the agent to recover that amount. Along with this civil remedy, the statute provides criminal penalties against persons knowingly making or receiving prohibited payments. Under the 1946 Act, coverage is limited to government contracts on a "cost-plus-a-fixed-fee or other cost reimbursable basis."[13]
 
 
 19
 Tucker, Norris, and Jack Epstein were indicted for violation of the Anti-Kickback Act and brought to trial in the United States District Court for the Eastern District of Pennsylvania. After presentation of the Government's case, in April 1956, a defense motion for acquittal was granted on the ground that the statute did not apply to this type of contract. The district judge felt that a negotiated fixed-price contract, with a price redetermination provision permitting a retrospective or prospective increase within a narrow range, was not a cost-reimbursable contract within the meaning of the Act. The court made scathing comments as to the conduct of the accused, observed that Acme had been victimized, and recommended legislation to amend the statute to apply to this situation. Because of the uncertainty with regard to the coverage of the 1946 Act, the Comptroller General thereafter recommended to Congress that it be revised. In the Act of September 2, 1960, an amendment was adopted which retroactively broadened the coverage of the statute to include all negotiated contracts (defined to mean all contracts made without formal advertising). No other essential change was made. 74 Stat. 740, 41 U.S.C. § 51.
 
 
 20
 The Government first claims that it was entitled to cancel Contract 1213 for violation of the original Anti-Kickback Act. It asserts that when Congress, in 1946, provided a civil remedy entitling the Government to recover the amount of the kickback, it did not intend to alter the pre-existing common law remedy of contract cancellation. The major stumbling block is the absence, so far as we know, of any decision or comment in support of the proposition that there was such a remedy at common law. In fact, the House Report on the 1946 Act states, "There is no existing statutory or other authority of law under which it may be said that the United States clearly has a right to recover the amounts of any such fees or gratuities." H.R.Rept.No. 212, 79th Cong., 1st Sess. 2 (1945). A fortiori, it is highly doubtful that there was any pre-existing right of the Government to cancel the entire contract of a prime contractor whose agents received improper kickbacks of which he was unaware.
 
 
 21
 In its effort to invoke a forfeiture, the most drastic civil penalty known to common law, the Government has cited only sparse collateral support. There are statements in United States v. Davio, 136 F.Supp. 423, 428 (E.D. Mich., 1955), that the Anti-Kickback Act codified the prior common law remedy. But that suit was for the recovery of amounts paid as kickbacks. Nowhere does the court hint that the Government had a pre-existing right of contract cancellation in the present circumstances.[14] Whether it was codifying an existing right or creating a new one, Congress, when it enacted the 1946 legislation, gave the Government only one civil remedy against contractors whose agents had received secret kickbacks. Had the legislature wished to provide the additional remedy of contract annulment, it could have done so. Cf. Armed Services Procurement Act of 1947, § 4, 62 Stat. 21, 23, 10 U.S.C. § 2306(b). In the absence of any statutory indication that the Government has a right to cancel the contract in this situation, it is not for the court to engraft a new and drastic remedy onto the Anti-Kickback Act. Cf. Unexcelled Chemical Corp. v. United States, 149 F.Supp. 383, 385, 137 Ct.Cl. 681, 684 (1957).
 
 
 22
 Furthermore, we have grave doubts about the applicability of the 1946 Act to the present contract. If it is not applicable, the Government's position must be rejected for the additional reason that in 1953 and 1954 there was no recognized federal public policy invalidating Contract 1213. Cf. Muschany v. United States, 324 U.S. 49, 66-67, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).[15] If the 1960 anti-kickback legislation was the first provision covering Contract 1213, the improper actions which took place in 1953 hardly contravened "long government practice or statutory enactments."[16] When Acme's agents received kickbacks about which plaintiff had no knowledge, it can scarcely be said that plaintiff (as distinguished from the agents) violated "obvious ethical or moral standards", and that its contract with the defendant could therefore be canceled on that ground.
 
 
 23
 The unreported district court decision granting the motion for acquittal of Tucker, Norris, and Jack Epstein is, of course, a direct holding that the 1946 anti-kickback legislation did not cover the present contract.[17] One of the primary reasons behind the enactment of the 1960 amendment was to remove serious doubt that fixed-price contracts with redetermination clauses were included in the act's coverage. See S.Rep. No.1585, 86th Cong., 2d Sess. 2-6 (1960). While the Tenth Circuit has held that the 1946 Act covers certain contracts having price-redetermination provisions, it emphasized that the contract with which it was dealing had "[n]o limitation * * * upon the range of redetermination or revision of prices, upward or downward." United States v. Barnard, 255 F.2d 583, 588 (C.A. 10), cert. denied, 358 U.S. 919, 79 S.Ct. 287, 3 L.Ed.2d 238 (1958). Acme's contract, however, had a limited range of upward revision. See finding 15. The applicability of the 1946 Act to Contract 1213 is thus highly questionable.
 
 
 24
 For these reasons, the present case is not like United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). There, the dual agent violated a federal conflict-of-interest statute, 62 Stat. 703, 18 U.S.C. § 434, in the negotiation of a contract entered into with the United States. Unlike our case, the statutory provision which the agent violated was undoubtedly on the books at the time of the misconduct. Also, the statute itself provided no more than a criminal sanction. Had the Supreme Court refused to imply a civil remedy, "the public [would] be forced to bear the burden of complying with the very sort of contract which the statute sought to prevent." 364 U.S. at 563, 81 S.Ct. at 316. Here, the civil remedy established by the statute enables the Government to recover any amounts it has paid out as a result of kickbacks; the public does not bear any part of the expenses illegally incurred. And most significantly, the violation in Mississippi Valley Generating Co. affected the validity of the entire transaction. In the negotiations preceding the contract, the Government was represented by a consultant who was, at the same time, associated with an investment banking company which stood to profit if the plaintiff was awarded the contract. The contract was the result of these tainted negotiations. In addition, the plaintiff itself was not altogether innocent, since it was well aware of the possible conflict of interest. 364 U.S. at 565 n. 19, 81 S.Ct. 294. The kickbacks with which we are concerned, however, were in no way related to the negotiation and execution of Contract 1213, and do not affect its validity. They were separate transactions made without the knowledge of the plaintiff, which certainly had nothing to gain by these secret dealings. The principles of Mississippi Valley Generating Co. do not require or suggest that the contract at bar could or should be canceled because of the secret receipt by Tucker-Norris of kickbacks from sub-contractors.[18]
 
 C. CONFLICT-OF-INTEREST STATUTES
 
 25
 Defendant urges that Acme's employment of Harold J. Lee and Charles G. Hochstuhl contravened certain provisions of the federal conflict-of-interest statutes, thereby making the contract voidable by the Government.
 
 
 26
 In the early stages of contract performance Acme was experiencing production problems with machines and tooling supplied by the Government under a companion facilities contract. At plaintiff's request Watervliet Arsenal ordered Harold J. Lee, a machinist lead foreman at the Arsenal, to report to Acme's Lansdale plant to assist plaintiff in its technical problems. Under his official orders Lee worked at Acme's plant from his arrival on April 20 until April 24, 1953, at government expense. The Arsenal refused Acme's request that it loan Lee's services for an additional week at government expense. Instead, Lee was given official permission to remain at the plant, advising plaintiff in an absent-without-pay status from April 27 to May 1, 1953. During this latter period he worked 96 hours, for which Acme paid him $5 per hour plus hotel expenses (compared to his government salary rate of $2.60 per hour). The amounts paid by Acme to Lee were charged against Contract 1213. Plaintiff was pleased with Lee's services and commended him to Watervliet Arsenal. Upon his return Lee filed with the Arsenal a trip report, which described the production problems he had observed and the advice he had given Acme personnel for their solution. In large part the report reflects the inexperience of Acme's personnel and their lack of necessary equipment. There is no evidence of any improper conduct on the part of plaintiff or of Lee — aside from the propriety of his being hired at all. The defendant concedes that Lee's employment by plaintiff did not affect his impartiality, a fact which is evident from the contents of his report and the effect of his testimony as a witness at the trial of this case.
 
 
 27
 A federal statute precluded any "employee of the United States or any department or agency thereof" from receiving "any compensation for any services rendered * * * in relation to any * * * contract * * * in which the United States is a party." 62 Stat. 697.[19] During the week he received a salary from Acme, Lee was not on the Government's payroll at all. We are not concerned with the undercover activities of an employee who pretends to be working for the Government while secretly performing services for a contractor. During that week, Lee received a reasonable salary from plaintiff and performed valuable services about which the defendant was fully informed. It may well have been poor judgment for Acme to hire, or the defendant to permit the hiring of, Lee's services under this arrangement (rather than detailing Lee for an extra week to Acme's plant on the Government's payroll). The fact remains that both parties acquiesced in the arrangement so that, for one week, Lee was not working for the Government at all; in effect, he became an Acme employee. As such, the compensation which he received did not fall under the statute and the harsh sanction of forfeiture need not be considered.
 
 
 28
 After Contract 1213 was awarded to Acme, Charles G. Hochstuhl of Philadelphia Ordnance District was assigned to administer it, along with other contracts. As part of his duties in connection with 1213, Hochstuhl recommended changes in the delivery schedule, and journeyed to Ohio in March 1953 in the company of Acme officials to show them existing gun-manufacturing facilities.[20] He was removed from his position with the Government effective August 4, 1953, "* * * for making material false statements and exaggerations on [his] application standard Form 57," relating to prior private employment. During his notice period, Hochstuhl looked for other work and was employed by Acme in August 1953, immediately following his release. The defendant advised Acme at the time that, for two years thereafter, Hochstuhl could not engage in negotiations with his former employer concerning Acme's contracts.
 
 
 29
 During the first few weeks of his employment by Acme, Hochstuhl helped Norris as a subcontract expediter. After Norris was discharged in September 1953 and replaced by Jack Epstein as superintendent of the Lansdale plant, Hochstuhl was designated Epstein's assistant. As such he was given a variety of assignments, all of them involving one form or another of paper work. He established a control system for subcontracts, prepared letters to Ordnance for signature by others, correlated plant inspections, and assisted in the preparation of requests for change orders. He had no personal contacts with government representatives in connection with plaintiff's contracts.
 
 
 30
 In the fall of 1953 Hochstuhl came across a number of vouchers and other cost records in the files, which related to repairs made by Acme to government-owned machines supplied under Facilities Contract 1214 (related to Contract 1213). On his own volition and in the interest of keeping adequate cost records, Hochstuhl undertook to segregate and allocate the cost records to individual machines; thereafter, as additional repairs were made to the machines, he kept a running record of them. There is no suggestion that this record was originally made for the purpose of a claim against the Government; in the fall of 1953 there was no prospect of the contract cancellation which took place in July-August 1954. In September 1954, at the direction of his superiors, Hochstuhl prepared an up-to-date record of Acme's expenditures in repairing the various government-owned machines. It was based on the data he had compiled a year earlier and had kept current in the meantime. The cost record was attached to a letter from Acme (signed by Sidney Cohen, its secretary-treasurer) to Ordnance on September 7, 1954, in which plaintiff refused to return the machines to the Government unless it gave assurance that Acme would be reimbursed for its cost of repairs. See finding 53.
 
 
 31
 The defendant charges that Hochstuhl's participation in the preparation of Acme's claim for reimbursement violated a penal conflict-of-interest statute, which provided that, "within two years after the time when [federal] employment or service has ceased," a former government employee may not "[prosecute] * * * any claims against the United States involving any subject matter directly connected with which such person was so employed." 62 Stat. 698. Casting aside any doubts that Hochstuhl's work for the defendant was "directly connected" with a claim made by Acme, we reach the question whether his services for Acme amounted to "prosecution" of such a claim. Hochstuhl simply compiled data on which his superiors based a claim which they presented to the Government. The basic information was first assembled by him purely as a matter of record-keeping, i. e. before there was any specific thought of a claim. Moreover, Hochstuhl's participation in the total claim process was merely clerical in nature. Other personnel in plaintiff's employ could just as readily have performed the relatively simple duties involved in compilation of costs relating to repair of machines, and his prior government service gave Hochstuhl no special knowledge or inside contacts which contributed to the undertaking in any way that we can see. There is a complete absence of evidence that Hochstuhl participated in the presentation of the claim to the Government after he had completed his assignment. On these facts, we hold that Hochstuhl's activities did not violate any conflict-of-interest statute or afford the defendant a valid basis for annulment of the contract.
 
 D. FALSE CLAIMS ACT
 
 32
 The last reason which the defendant gives for vitiating the contract is the presentation of certain allegedly false claims for payment, both before and after cancellation. As a result of these submissions, the Government argues, Acme's claim was subject to forfeiture under 62 Stat. 978, 28 U.S.C. § 2514,[21] and the corporation may be fined under the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231.[22]
 
 
 33
 In offering cost figures to the Government on April 29, 1954, in support of its request under the price-redetermination clause for allowance of the maximum ceiling price, plaintiff included certain costs which, while actually expended, are said by defendant not to have been properly chargeable to this contract. These were: subcontractors' costs which included without specification commissions which they had paid to the Tucker group; $12,000 which All Metals had included in its subcontract price to Acme as a result of the extortion scheme carried out by Tucker, Norris and Jack Epstein; payments of salaries and/or commissions by plaintiff to Tucker; $1,045.52 charged by Norris against the contract for personal services rendered by plaintiff's employees on Norris' farm (the facts of which were first discovered by the Government in December 1953); $470 plus hotel expenses paid by plaintiff to Harold J. Lee, whose services have previously been described; and minor hotel, meal and entertainment charges for government employees. The defendant's Board of Awards approved the requested increase in the price on the basis of revised data, but final action was not taken because the contract had been canceled in the meantime.
 
 
 34
 Another set of allegedly false claims came during the pendency of this suit when the parties held settlement negotiations. In conjunction with these efforts, plaintiff submitted the fiscal aspects of its claim to the Government in August 1958 on a standard contract-termination form, certifying in part that "they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a claim or claims against the United States * *." In its proposal, plaintiff reclassified several of the previously-mentioned cost items as General and Administrative expenses rather than direct charges, thus allocating only a portion of them to the performance of Contract 1213. This settlement claim was subsequently rejected.
 
 
 35
 With some modifications the same cost items were again submitted by plaintiff in June 1961 in response to the issuance of an order by the court under former Rule 28(b). This last submission, which dealt separately with the plaintiff's claims and those of its subcontractors, was accompanied by a letter in which plaintiff said that it had not audited the subcontractors' claims but believed them to be accurate; the covering letter also invited the Government to confer with plaintiff as to any items in the claim which were not properly includable. This Rule 28 damage schedule eliminated certain costs which had been objected to in the termination settlement proposal (payments to Lee, expenses in connection with Norris' farm, certain travel expenses of Tucker, and a few entertainment expenses). Other controverted expenditures were, however, retained in the category of General and Administrative expenses, so that they were proportionately allocated to the contract in suit (i. e., Tucker's salaries and/or commissions paid by plaintiff and the subcontractors).
 
 
 36
 The defendant has asked not only that the plaintiff's entire claim be forfeited for practicing "fraud against the United States in the proof * * * thereof" (62 Stat. 978, 28 U.S.C. § 2514, supra); it has also filed a counterclaim under the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231, supra, seeking an affirmative judgment of $6,000 for plaintiff's misrepresentations in the price redetermination proceedings, in the termination settlement proposal, and in the schedule submitted pursuant to former Rule 28(b). But "fraud, resulting in forfeiture, can be found only on the basis of clear and convincing evidence." Chelsea Factors, Inc. v. United States, 181 F.Supp. 685, 691, 149 Ct.Cl. 202, 212 (1960). In the Government's effort to supply such "clear and convincing evidence," there is at least one large gap. Plaintiff's costs, exclusive of those challenged as improper, overwhelmingly exceeded the contract ceiling price for which the application in April 1954 was designed to obtain approval. In a letter sent to the Philadelphia Ordnance District in connection with the application, Acme's accountants noted that certain "recommendations of the Army Audit Agent as to record keeping were not followed because the difference between the ceiling price and the actual costs incurred was so great that any further expenditures on this job should not be undertaken unless * * * absolutely necessary." At the same time, the accounting firm pointed out that the Army would have to disallow $600,000 of Acme's costs in order to fall below the ceiling price of $1,191,077. Defendant's Exhibit 70. The inclusion of the controverted items was thus unnecessary to justify receipt of the ceiling price. Plaintiff had nothing to gain by insertion of these disputed amounts in its claim. That circumstance strongly tends to negate the affirmative intent to defraud which defendant must establish.[23]
 
 
 37
 Moreover, at the time of the submission of the 1958 and 1961 claims, and probably as early as the initial claim in April 1954, the defendant was aware of the facts concerning each of the allegedly false items. Also, the plaintiff had actually expended the sums involved and, at least in several instances, the propriety of charging them as contract costs, either directly or indirectly by allocation through an overhead account, was debatable or a matter of judgment. While the inclusion of these items may have displayed poor judgment, we are not convinced, in the circumstances, that the plaintiff was endeavoring to deceive.[24]
 
 
 38
 Citing United States v. Fox Lake State Bank, 225 F.Supp. 723, 724-725 (N.D.Ill., 1963), defendant argues that it is required, as a precondition of forfeiture, to show only that Acme knowingly submitted false claims. But Fox Lake involved the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231, which does not encompass forfeiture as a sanction. To justify cancellation of the contract, the Government must prove its case under 62 Stat. 978, 28 U.S.C. § 2514, which provides for forfeiture of claims made by "any person who corruptly practices or attempts to practice any fraud against the United States." The statute also requires that the Court of Claims "specifically find such fraud or attempt." An actual intent to defraud is a prerequisite to annulment of the contract under these provisions. See e. g., Pewee Coal Co. v. United States, 161 F.Supp. 952, 958, 142 Ct.Cl. 796, 806 (1958), cert. denied, 359 U.S. 912, 79 S.Ct. 588, 3 L.Ed.2d 574 (1959); Kamen Soap Products Co. v. United States, 124 F.Supp. 608, 620, 129 Ct.Cl. 619, 641 (1954).
 
 
 39
 For the same reasons, a related defense asserted by the Government must likewise fail. The defendant contends that, independently of any statutory provision, it was entitled, on the basis of Carrier Corp. v. United States, Ct.Cl., No. 346-59, decided Feb. 14, 1964, 328 F.2d 328, to cancel the contract for the fraudulent and illegal acts of the contractor. But in Carrier the court stated unequivocally, "There is no doubt that a fraud was committed." 328 F.2d at 334. In the present case, we have, as we have said, very grave doubts that Acme, through submission of the disputed claims, ever intended to defraud the Government. Defendant has failed to bear its burden of proving the defense of fraud.[25]
 
 
 40
 We come now to defendant's counterclaim for $6,000 under the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231, which imposes a $2,000 fine for "any claim upon or against the Government" submitted by one "knowing such claim to be false, fictitious or fraudulent." If Acme included cost items in its 1954 price-redetermination statement even though it knew them to be false, it is subject to a $2,000 fine. See, e. g., United States v. Fox Lake State Bank, 225 F. Supp. 723, 724-725 (N.D.Ill., 1963); but see United States v. Park Motors, Inc., 107 F.Supp. 168, 174-177 (E.D.Tenn., 1952).[26] Although Acme could not be certain that expenses such as the salaries paid to Tucker were not reimbursable, it could have had no similar doubts regarding the personal services rendered by Acme employees on Norris' farm. This matter was brought directly to the attention of Acme officials by the Federal Bureau of Investigation, but plaintiff failed to remove Norris' personal expenditures from the charges claimed on Contract 1213. Finding 26. This $1,045 charge was subsequently included as a cost component in Acme's April 1954 request for the contract ceiling price. In that manner, plaintiff knowingly submitted a false claim and is subject to a fine of $2,000.
 
 
 41
 The Government maintains that inclusion of the same items in the claims submitted by Acme in 1958 and 1961 justifies the imposition of two more civil penalties of $2,000 each. But Norris' farming expenditures were not included in the 1961 statement, and it is difficult to imagine that plaintiff even recalled this item when it submitted the 1958 termination-cost proposal. Moreover, we are not dealing with different expenditures; the subsequent claims contained the same costs which the Government had previously challenged. The present case is unlike those in which numerous vouchers are submitted to the Government, and each contains a separate and distinct false claim for which the fine may be validly imposed. E. g., United States v. Ueber, 299 F.2d 310, 313 (C.A. 6, 1962); United States v. National Wholesalers, 236 F.2d 944, 950 (C.A. 9, 1956), cert. denied, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724 (1957). We are faced, rather, with one false claim, which was denied by the Government and thereafter reasserted by the plaintiff. The court holds that the defendant cannot recover more than once for the very same false claim; it is therefore entitled only to $2,000 by way of counter-claim.
 
 
 42
 In sum, we conclude that none of the legal defenses which the Government has asserted justifies its cancellation of the contract in the summer of 1954 for the alleged fault of the contractor. When the Government is displeased with the contractor's administration of an agreement, it may always sever contractual relations under the standard termination-for-convenience clause inserted in its contracts. John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381, cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). But if the United States seeks instead to annul a contract for fault, thereby leaving the contractor wholly uncompensated, it must have proper justification for such harsh consequences. Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961); Nesbitt v. United States, Ct.Cl., 345 F.2d 583, fn. 2, decided May 14, 1965.
 
 II. PLAINTIFF'S DAMAGES
 A. GENERAL STANDARD
 
 43
 Having rejected each of the absolute defenses urged by the Government, we must determine the appropriate measure of damages incurred as a result of the improper cancellation. The position advanced by the defendant, and accepted by the Trial Commissioner, is that plaintiff is entitled only to the traditional remedy of damages given by this court for breach of an express contract. The purpose of that remedy is to place the party against which the breach has been committed in the position it would have held if the contract had been fully performed. Acme had suffered large losses in the performance of Contract 1213 at the time it was wrongly canceled by the defendant. According to projections, however, Acme would have been able to reduce its losses considerably had it been permitted to complete the contract. The Trial Commissioner therefore determined that plaintiff was entitled to recover any post-cancellation costs incurred as a result of the Government's erroneous action, plus the amount by which it would have been able to decrease its losses through completion of the contract. In this way, the Commissioner reasoned, Acme would be given the same benefits it would have received had it been permitted to carry out the agreement.
 
 
 44
 Plaintiff's main argument is that it is entitled to restitution as an alternative remedy. Under that standard of relief, a party whose contract has been repudiated or otherwise breached may, if he meets certain conditions, recover the reasonable value of his services, measured as of the time of performance. The purpose is to restore the injured party to the pre-contract status quo, not to put him in his post-contract position. Restitution has long been recognized by the commentators as one of three possible remedies for the substantial breach of an express contract, the others being damages and specific performance. See Restatement, Contracts §§ 347-57; 5 Corbin, Contracts §§ 1102-21 (1951); 5 Williston, Contracts §§ 1454-85 (rev. ed. 1937). The Restatement contains a full discussion of restitution in its chapter entitled "Judicial Remedies for Breach of Contract." Corbin states explicitly, "In the present chapter we are dealing with restitution as a remedy for breach of contract; a judgment for such restitution is as truly a remedy for a `breach' as is a judgment for damages." 5 Corbin, Contracts § 1104 (1951). The applicability of restitution as an alternative remedy for breach is also well-established in both the federal and the state courts. E. g., Michael Del Balso, Inc. v. Carozza, 78 U.S.App.D.C. 56, 136 F.2d 280 (1943); United States for use of Susi Contracting Co. v. Zara Contracting Co., 146 F.2d 606, 610 (C.A. 2, 1944); Southern Painting Co. v. United States ex rel. Silver, 222 F.2d 431, 433-34 (C.A. 10, 1955); Valente v. Weinberg, 80 Conn. 134, 67 A. 369, 13 L.R.A.,N.S., 448 (1907); Pelletier v. Masse, 49 R.I. 408, 143 A. 609 (1928).[27]
 
 
 45
 Although the Court of Claims has permitted quantum meruit recovery for contracts implied in fact (see, e. g., New York Mail & Newspaper Transp. Co. v. United States, 154 F.Supp. 271, 276, 139 Ct.Cl. 751, 759, cert. denied, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957)), no past contractor has successfully sought restitutionary relief for breach of an express contract. But unless this form of recovery is precluded by our general jurisdictional statute, 28 U.S.C. § 1491, we must be guided by the principal that, "When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments." Perry v. United States, 294 U.S. 330, 352, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935). See, also, New York Mail & Transp. Co. v. United States, supra, 154 F.Supp. at 276, 139 Ct.Cl. at 759; Refining Associates, Inc. v. United States, 109 F.Supp. 259, 261, 124 Ct.Cl. 115, 120 (1953). Since contracts with the United States are to be governed by the same principles as "those between man and man" (Gilbert v. United States, 1 Ct.Cl. 28, 37 (1863), aff'd, 75 U.S. (8 Wall.) 358, 19 L.Ed. 303 (1869), and see Padbloc Co. v. United States, 161 Ct.Cl. 369, 377 (1963)), we are obliged to award restitution to a petitioner meeting the prescribed qualifications, unless there is some jurisdictional impediment.
 
 
 46
 The Tucker Act empowers this court "to render judgment upon any claim against the United States founded * * * upon any express or implied contract with the United States * * *." 28 U.S.C. § 1491. Although this precludes recovery on the basis of a contract merely implied in law (see Sutton v. United States, 256 U.S. 575, 581, 41 S.Ct. 563, 65 L.Ed. 1099 (1921)), the plaintiff seeks restitution for breach of an express contract, which clearly comes within the ambit of the Act. The cases cited by the Trial Commissioner simply denied "quantum meruit" (i. e. restitutionary) recovery for the alleged breach of an express contract where the court determined that no breach had in fact taken place. See Lacchi Constr. Co. v. United States, 102 Ct.Cl. 324, 355-356 (1944); Frazier-Davis Constr. Co. v. United States, 100 Ct.Cl. 120, 161-162 (1943); Steel Products Eng'r Co. v. United States, 78 Ct.Cl. 410, 418 (1933).[28]
 
 
 47
 The Government says that, even if restitution is an available remedy, Acme has not met the conditions necessary for recovery on that basis. The accepted rule is that,
 
 
 48
 If the performance that the contract required of the plaintiff has been wholly prevented, and if the result of his labor and expenditure still belongs to him, he has no remedy by way of restitution. If the performance required was the production and delivery of a finished article, and the defendant wrongfully prevents completion and delivery of the article, the plaintiff cannot get judgment for the reasonable value of his work and labor in preparation to perform, except so far as it may be included in a claim for damages. Such work and labor is not itself requested or received by the defendant.
 
 
 49
 Restatement, Contracts § 348, Comment "c". Defendant contends that Contract 1213 was for the purchase of (completed, 75 mm. recoilless rifles from plaintiff, and therefore contemplated "the production and delivery of finished article[s]," for the breach of which plaintiff is entitled only to damages. This misconceives the nature of the contract which states, expressly, that Acme is to "furnish and deliver" specified items (emphasis added). The entire pre-contract negotiations were based on the assumption that it was Acme which would manufacture the requested rifles. The defendant at first had reservations about plaintiff's ability to perform the contract, but, after investigating Acme's plant and personnel, the Government concluded that Acme and its subcontractors would be capable of carrying out the agreement. Defendant's Exhibit 12. One of the contemplated benefits of awarding the contract to Acme was that "placing this procurement [in] subject contractor's plant will not only broaden the manufacturing base but create a salutary effect, pricewise, on all other procurements of this type." Ibid. Thus, the Government contracted not only for a finished product, but also for the manufacture of that product by Acme. When an agreement of this nature is breached, restitution is available.
 
 
 50
 The next argument is that plaintiff's recovery must be limited to the reasonable value of the goods it actually delivered prior to cancellation. It is clear, however, that restitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party. "Judgment will be given for the value of service * * * rendered, even though the product created thereby has been lost or dstroyed by the defendant, and even though there never was any product created by the service that added to the wealth of the defendant." Restatement, Contracts § 348, Comment "a" (emphasis added). It is when the plaintiff is the party in default that his recovery may be limited by the amount of the benefit to the defendant. See Schwasnick v. Blandin, 65 F.2d 354, 357 (C.A.2, 1933). But "if the promisee has performed so far as he has gone, and the promisor breaks his promise, the promisee may abandon the contract and sue for restitution, in which he can recover the reasonable value of his services, measured by what he could have got for them in the market, and not by their benefit to the promisor." Ibid. See, also, Restatement, Contracts § 347, Comment "c". Acme's recovery is not limited to the value of the goods received by the Government under the contract; rather, it can be based on the reasonable value of the entire performance.
 
 
 51
 Acme's position is that the reasonable value of its services is most accurately reflected by the actual costs it incurred in the performance of Contract 1213. As the best means of restoring the status quo ante, cost of performance is often used as the basis for determining the amount of quantum meruit recovery, in the absence of "any challenging evidence." United States for Use of Susi Contracting Co. v. Zara Contracting Co., 146 F.2d 606, 611 (C.A.2, 1944); see, also, United States for use of Arc & Gas Welder Associates, Inc. v. Blount, 182 F.Supp. 648, 665 (D.Md.), aff'd, Arc & Gas Welder Associates, Inc. v. Green Fuel Economizer Co., 285 F.2d 863 (C.A.4, 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); United States for use of Wander v. Brotherton, 106 F.Supp. 353, 354-355 (S.D.N.Y.1952). But if the defendant is able to show that the costs incurred by the contractor were excessive (as a result, for example, of inefficiency or extravagance), the amount of recovery is commensurately reduced. Cf. Barrett Co. v. United States, 273 U.S. 227, 235, 47 S.Ct. 409, 71 L.Ed. 621 (1927); United States v. Behan, 110 U.S. 338, 345-346, 4 S.Ct. 81, 28 L.Ed. 168 (1884).[29]
 
 
 52
 The record before us is inadequate to determine whether Acme's costs were, in fact, excessive. Plaintiff's expenses appear to be inordinately high even if one takes into account its lack of experience in this manufacturing line and the prospective advantage to the Government of broadening the base of procurement. The contract ceiling price, for instance, was $384.95 per unit, but plaintiff's actual cost in manufacturing the first 446 rifles was $1,179.29, and its cost of production during the last six months of the contract was $690.21. See findings 7, 52(a), (c). Although it is conceivable that these expenditures accurately reflect the value of Acme's services, the present record does not provide enough information for a sufficiently accurate answer. In particular, it would seem important to compare Acme's costs with those of other manufacturers of the same rifles during that period, taking into consideration that Acme should be permitted greater reimbursement than established manufacturers because of its inexperience and the anticipated benefits of its entry as a competitor. Since this issue was not squarely presented at the original trial, the defendant had no real opportunity to prove that plaintiff's costs were inflated; it should be permitted to do so now. We are therefore remanding the case to the Trial Commissioner under Rule 47(c) for a separate determination of liability.
 
 
 53
 To the extent that Acme's actual costs are used in making this determination, the Commissioner should consider that the amounts which plaintiff paid its sub-contractors latently included reimbursements for kickbacks paid to various members of the Tucker organization. See findings 18-25. Although the defendant has not attempted to prove that any of the subcontract prices were inordinately high, the kickbacks involved were hardly ordinary business expenses incurred in manufacturing 75 mm. rifles. If Acme's total costs are to measure the value of its services, they must be reduced by any kickbacks actually paid to the Tucker organization by plaintiff's subcontractors. Nor should Acme be reimbursed for the amounts it paid to Tucker; for the reasons given in the companion case, we conclude that his employment violated the covenant against contingent fees. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 538-59, 347 F.2d 538, decided this day.[30] Tucker's salaries cannot be considered reasonable expenses which enhanced the value of Acme's services to the Government. Neither the contingent fee payments nor the kickbacks may be included in the computation of Acme's restitutionary recovery.[31]
 
 B. GOVERNMENT-FURNISHED MACHINERY
 
 54
 Plaintiff urges that a determination of the reasonable value of its contract performance must take into account costs incurred as a result of defective government-furnished machinery. By supplying deficient equipment, it is alleged, the defendant forced Acme to render additional services, which had market value and are compensable under the theory of restitutive recovery. The purportedly defective machinery was, however, furnished under a separate facilities contract, not the main contract. That agreement explicitly disclaimed liability "for damages or loss of profit by reason of any delay in delivery or failure to deliver any or all of the items set forth * * *, or for delivery of such items not in satisfactory operating condition or not of a suitable type." (Emphasis added.) The contract also stipulated, "In the event [government-furnished] items are not in fit operating condition, the Contractor shall repair, restore, or rehabilitate such equipment so as to make it serviceable or fit for use (cost connected with such repairs, restoration, or rehabilitation shall not be reimbursed to the Contractor)." If the provisions concerning government property had been included in the main contract, such a disclaimer or limitation of liability for breach of warranty would possibly have to be disregarded under plaintiff's theory, which fixes the measure of recovery by the value of the services performed, rather than by the terms of the breached contract providing or restricting compensation. But the facilities contract was separate and was not materially breached; its clauses limiting liability remain in effect.[32] We must therefore determine whether the plaintiff is correct that the disclaimer clause is less-than-absolute and does not bar recovery for increased costs resulting from defective government machinery.
 
 
 55
 Plaintiff would have us read this disavowal of liability as applicable only to ordinary repairs made following delivery of the equipment. Because the disclaimer refers to Acme's obligation to repair the machinery in case of "delivery of such items not in operating condition," Acme infers that the cost of extraordinary repairs incurred in the course of performance was to be borne by the defendant. Aside from the practical difficulty of separating "normal" and "extraordinary" expenses, there is a more basic objection. The terms of the disclaimer are broad, and refer to Acme's duty to repair items "not in operating condition," without imposing any limitation as to the time when the equipment becomes inoperable or the amount of work required to fix it. There is no reason to qualify or limit the general sweep of the contract words.
 
 
 56
 On the other hand, along with the disclaimer, the facilities agreement also specified that, if the equipment supplied by the Government required repair as a result of defects present at the time of delivery, the "Contracting Officer, upon written request of the Contractor, may equitably adjust the price, the time of performance, and other terms and conditions of the affected supply contract(s). * * * Any failure by the parties hereto to agree upon such equitable adjustment shall be determined in accordance with the article of the related supply contract(s) entitled `Disputes'." See finding 35. We do not interpret these provisions as inconsistent with the explicit disavowal of liability. Instead, they specify the only form in which relief can be obtained for injuries resulting from substandard machinery furnished by the defendant; unless the contractor makes timely written request for an equitable adjustment, he must, according to the disclaimer, bear all costs of resulting delays and repairs. See, generally, Goodwin, Government-Furnished Property, Government Contracts Monograph No. 6, p. 17 (1963); Paul, United States Government Contracts and Subcontracts 267 et seq. (1964).[33]
 
 
 57
 During the course of contract performance, Acme made at least two written requests for reimbursement of costs incurred as a result of defects in equipment supplied by the defendant. See finding 39(b) (2), (6). About one week after cancellation, on August 26, 1954, the plaintiff filed a claim with the Philadelphia Ordnance District, asking to be repaid for all parts which it purchased to make the defendant's machinery workable. Finding 44(a). This August 1954 request is challenged by the defendant as untimely. Considering all the circumstances, we cannot agree. The machinery was supplied to plaintiff throughout 1953; although some performed reasonably well, other pieces required constant tinkering and broke down repeatedly, disrupting the smooth flow of production. See findings 39(b), 43(c). At least as late as May 1954, flaws in the government machinery were still being encountered (see finding 39 (b) (11)), and, if past experience is the guide, such difficulties were probably prevalent until the suspension of contract performance a little over a month later. Had plaintiff been required to ask for an equitable adjustment each time a minor defect was discovered, the result would have been a continuous flow of such requests to the contracting officer. The time and effort expended by both parties in effecting numerous equitable adjustments would have been excessive. Instead, Acme apprised the defendant of the various difficulties at approximately the time they were encountered, but, with several minor exceptions, it in effect waited until after the abrupt termination of the contract to make a single request for compensation. This was undoubtedly the most efficient manner of obtaining relief. Plaintiff's cumulative demand for reimbursement in August 1954, as well as the two requests made prior to annulment of the contract, were timely.
 
 
 58
 Plaintiff's letters sought reimbursement for repair costs, without specifically invoking the equitable adjustment provision of the facilities contract or the Disputes article of the supply contract. But the letters were easily understandable, and the failure to delineate the precise clauses permitting recovery should not stand as a bar. Cf. Specialty Assembling & Packing Co. v. United States, 298 F.2d 794, 796, 156 Ct.Cl. 252, 254-255 (1962). To the extent that the trial commissioner finds that these timely claims for reimbursement reflect actual costs incurred by the contractor because of defective government equipment — rather than its own inexperience or inefficiency — the plaintiff is entitled to an equitable adjustment as provided in the facilities contract. This equitable adjustment should be added to the determination of the value of the rest of plaintiff's performance.[34]
 
 III. LIQUIDATED DAMAGES
 
 59
 Throughout the contract plaintiff was behind in its deliveries. The original schedule was substantially revised in supplemental agreements executed in August 1953 and January 1954. Despite these time extensions, plaintiff was still late in deliveries at the time of the suspension of its contract in July 1954, and was assessed liquidated damages pursuant to the contract clause. On that basis, $53,715.19 was withheld from payments otherwise due. Claiming that the liquidated damages provision was erroneously invoked, Acme asserts that it is entitled to reimbursement of the entire amount.
 
 
 60
 There is a question whether plaintiff is barred from making this claim because it did not request a decision of the contracting officer on the cause of its tardy deliveries. In Contract 1213, the clause dealing with liquidated damages contains a paragraph excusing the contractor from paying liquidated damages when the delay arises out of causes beyond his control and without his fault or negligence. It says that in such cases, subject to the Disputes clause, "the Contracting Officer shall ascertain the facts and extent of the delay and shall extend the time for performance when in his judgment the findings of fact justify an extension." The Disputes clause says simply that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer * * *."[35] It cannot be said that these provisions, taken together, required the contractor to make a specific request to the contracting officer for a determination of the reasons for the delays. So long as the contracting officer was put on notice that the plaintiff wanted to avoid the levy of liquidated damages, the minimum demands of the contract would be met.
 
 
 61
 This is precisely the effect of a letter sent on May 20, 1954, by plaintiff to the Comptroller General via Philadelphia Ordnance District. The contracting officer refused to forward the letter as requested, because he felt that the appeal was addressed to equitable rather than legal considerations and would not be cognizable by the Comptroller General. After being told of the contracting officer's action, Acme wrote another letter to him on June 21, 1954, explicitly reaffirming the prior request and "asking relief from our Liquidated Damages Clause at the District level" (emphasis added). This notification was quite different from the "mere ambiguous requests for adjustments or possible negotiations" which were deemed insufficient in Specialty Assembly & Packing Co. v. United States, supra, 298 F.2d at 796, 156 Ct.Cl. at 255. Acme's letters put the defendant on notice both as to the relief requested and the contract clause on which the request was based; furthermore, in its June 21st letter, plaintiff invited a ruling by the contracting officer. It is clear that plaintiff was in effect asking for an equitable adjustment; the need for a degree of precision, as suggested in Specialty Assembling, was met. When the defendant suspended all production on July 22, 1954, and completely canceled the contract a month later, the contracting officer had taken no action on Acme's demand for remission of liquidated damages; the annulment of the agreement destroyed the administrative appeal mechanism created by the contract. Since Acme properly sought to invoke its administrative remedies as long as they were available, the Government's defense of failure to exhaust must be rejected.
 
 
 62
 Having surmounted this procedural defense, plaintiff is entitled to recover on its claim for remission of liquidated damages, because the delays on which the assessment was based were caused by the Government as well as by Acme. On the one hand, the plaintiff's difficulties in operating the government machinery were partially attributable to the inexperience and incompetence of its own personnel. On the other, defects in some of the equipment furnished by the defendant resulted in repeated failures and breakdowns. While some of the machines performed reasonably well if properly operated, the smooth flow of production was rendered impossible when other machines essential to a sequence of operations were in disrepair. See finding 43. "[W]here delays are caused by both parties to the contract the court will not attempt to apportion them, but will simply hold that the provisions of the contract with reference to liquidated damages will be annulled." Schmoll v. United States, 91 Ct.Cl. 1, 28 (1940). See, also, United States v. United Eng'r & Contracting Co., 234 U.S. 236, 242, 34 S.Ct. 843, 58 L.Ed. 1294 (1914); Vogt Bros. Mfg. Co. v. United States, 160 Ct.Cl. 687, 709 (1963); Commerce Intern. Co. v. United States, Ct. Cl., 338 F.2d 81, 90, decided Oct. 16, 1964. That result is fair. It does not deprive the Government of an opportunity to prove and recover its actual damages caused by the contractor's delay[36]; instead, the defendant merely loses its right to insist on an artificial measure of damages agreed on by the parties for the situation in which the contractor alone is responsible for the delay.[37]
 
 IV. SUBCONTRACTORS' RIGHT TO RELIEF
 
 63
 Along with its own claim, Acme has brought suit on behalf of a number of firms to which it sublet portions of the prime contract. The three major subcontract claims are those of All Metals Industries, Manalapan Machine Works, and Foley Machine Company. Each of these subcontractors obtained orders from Acme through the payment of kickbacks to Harry K. Tucker, Jr.[38] See findings 18-23. At the time the kick-backs were given, All Metals knew of Tucker's double agency, and the other two subcontractors either knew or should have known of it. On the other hand, Acme was unaware of Tucker's duplicity.
 
 
 64
 When a contract is obtained by a person secretly acting as a dual agent, and one party knew or should have known of the double employment, only the innocent party has the option of either affirming or avoiding the agreement.[39] Affirmance is not effective as ratification until after the innocent party obtains full knowledge of the material facts concerning the fraudulent procurement. See Restatement, Agency 2d, §§ 91, 313. In the present case, it was not until well after cancellation of its prime contract that Acme, the innocent party, learned of the kickback arrangements. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 538-59, 347 F.2d 538, fn. 20, decided this day. Prior to that time, it did not have the requisite knowledge to effect ratification.
 
 
 65
 When its prime contract was canceled by the Government, Acme responded by immediately requesting all its subcontractors to halt performance. From that time forward, the plaintiff had nothing to gain by ratification of its voidable subcontracts. Yet long after conclusion of performance, Acme has nonetheless chosen to "ratify" these agreements. The reason is not difficult to discern: Only if Acme is liable to the subcontractors, may Acme recover from the defendant in their behalf. See J. L. Simmons Co. v. United States, 304 F.2d 886, 158 Ct.Cl. 393 (1962). Acme was apparently willing to affirm the agreements on the theory that the Government would probably bear any resulting liability.[40] As is pointed out in the discussion of All Metals' claim in the companion case, No. 538-59, this form of after-the-fact ratification cannot be accepted since it violates the rule that "affirmance is * * * inoperative as ratification * * * as against persons who in the meantime have acquired interests with which it would be unjust to interfere." 2 Williston, Contracts § 278A n. 1 (3d ed. 1959).[41] See, also, Restatement, Agency 2d, § 101(c). Had Acme acted reasonably, avoiding these subcontracts after it found out about the improper double agency, the Government would not be liable. This freedom from liability is an "interest with which it would be unjust to interfere." Acme's attempt to destroy that interest by post-cancellation ratification of the moribund subcontracts is unavailing.
 
 
 66
 It is still necessary to determine whether the Government would be liable to All Metals, Manalapan, and Foley, if Acme had in fact avoided these subcontracts, as we have held it was bound to do. Before a contract may be rescinded because of its fraudulent procurement by one of the parties, to prevent unjust enrichment, the defrauded party is generally required to return the goods it received under the contract, or their reasonable value. See Restatement, Restitution §§ 65, 66. Since these three subcontractors would have been entitled to the reasonable value of the goods they actually delivered, the defendant should in turn be liable to that extent.[42] Cf. Crocker v. United States, 240 U.S. 74, 81-82, 36 S.Ct. 245, 60 L.Ed. 533 (1916). In the future proceeding before the Commissioner, if plaintiff is able to prove that the value of the items delivered by any of the three subcontractors exceeded the total amount it was paid, then recovery on behalf of that subcontractor will be permitted — unless the "Severin" doctrine is a bar (see footnote 41, supra).
 
 
 67
 With respect to the claims of the remaining subcontractors, there has thus far been inadequate proof of damages. Although the defendant audited the accounting records of each one, such verification is no substitute for actual evidence of injury. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 271 (1962). When this question arose during the trial, plaintiff's counsel acknowledged that further proof was required, explaining that, although the other subcontractors had been invited to submit more detailed claims, they had failed to do so. Tr. 1396-97. These claims being unproved, they cannot be accepted at the present time. Plaintiff, however, may present further proof, if it can, in the proceedings under Rule 47(c).
 
 V. INTEREST
 
 68
 The last matter is the plaintiff's demand for interest from January 1, 1955, on those parts of its overall claim for damages represented by (1) the improper assessment of liquidated damages by the defendant, (2) the withholding of amounts due under the price redetermination provision of the contract, and (3) the failure to pay the equitable adjustment requested in August 1954 for repairs of government-furnished machinery. These amounts, the plaintiff says, were retained by the defendant without any color of right and thus come within the circle of the Fifth Amendment's guarantee that property shall not be taken for public use without payment of just compensation. This type of demand is not novel in suits on government contracts; nor is its steadfast repudiation by the courts. See, e. g., United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 658-659, 67 S.Ct. 601, 91 L.Ed. 577 (1947); United States v. North American Transp. & Trading Co., 253 U.S. 330, 335-336, 40 S.Ct. 518, 64 L.Ed. 935 (1920); Komatsu Mfg. Co. v. United States, 131 F.Supp. 949, 132 Ct. Cl. 314 (1955); Ramsey v. United States, 101 F.Supp. 353, 355-357, 121 Ct.Cl. 426, 430-33 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952).
 
 
 69
 Plaintiff concedes that, under the case law, unless the Government acted in bad faith when it withheld the funds in dispute, there could be no violation of the Fifth Amendment, and recovery of interest on the basis of the contract would be prohibited by 28 U.S.C. § 2516(a), permitting this court to allow interest on a claim "only under a contract or Act of Congress expressly providing for payment thereof." To show bad faith, the plaintiff stresses a determination by the Department of Justice in December 1954 that it would bring no civil or criminal action against Acme. But, plainly, this was not tantamount to a finding of bad faith on the part of the Army; a difference of opinion is not proof of malice. The plaintiff also alleges that, at the time of cancellation, the Government did not have proof that plaintiff was guilty of fraudulent acts which would justify annulment; that the Government knew that its proposed action might force plaintiff into bankruptcy; and that the real cause of the cancellation was the defendant's decision to discontinue production of 75 mm. recoilless rifles because they were obsolete. At the trial of this case, an Ordnance attorney who advised that Contract 1213 be rescinded testified that, at the time, he deemed this action appropriate because he thought plaintiff had violated the covenant against contingent fees, as well as the anti-kickback and false claims statutes. Tr. 1024-25. Assessing the credibility of this witness and the others who testified as to the matter, the Trial Commissioner concluded that the defendant canceled the contract for two equally potent reasons: the termination of military requirements for the 75 mm. rifles and the contractual irregularities thought to be present. Finding 50(a). The circumstantial evidence submitted by plaintiff to overcome the presumption of correctness attaching to the Commissioner's finding is wholly inadequate for that purpose. Cf. Commerce Intern. Co. v. United States, Ct. Cl., No. 287-55, decided Oct. 16, 1964, 338 F.2d 81, 86; Davis v. United States, Ct.Cl., No. 179-59, decided Feb. 14, 1964, slip op., pp. 4-5. We must therefore turn aside Acme's argument that the Government acted in bad faith.
 
 
 70
 Our conclusion is sustained by an examination of the specific claims which, according to plaintiff, were rejected in bad faith. The Government withheld liquidated damages, thinking that the contract gave it the right to take such action. The court's determination that liquidated damages were not properly assessable in no way negates the existence of a bona fide dispute involving difficult legal issues. Similarly, so far as can be ascertained, the defendant had almost concluded at the time of the contract annulment that the plaintiff would be entitled to the ceiling price under the redetermination clause. But it withheld this amount, along with other entitlements, because of an honest belief that plaintiff's conduct merited forfeiture. Although the defendant erred in believing that it could annul Acme's contract for violation of such provisions as the covenant against contingent fees, it cannot be charged with bad faith. Finally, the Government's failure to allow an equitable adjustment for expenses incurred in repairing machinery furnished under the facilities contract is attributable to its view that the disclaimer provision was absolute. In none of these instances was the defendant's action without some color of right. Even though a court may determine eleven years later that the Government's premises were faulty, that does not alter the bona fide character of its original actions under the contract or convert the erroneous cancellation of the contract into a taking.[43]
 
 VI. SUMMARY
 
 71
 The case is remanded to the Trial Commissioner for a determination, under Rule 47(c), of the defendant's liability to Acme, based on (a) the reasonable value of its performance under Contract 1213; and (b) an equitable adjustment for the amounts expended under the facilities contract for repair of defective government machinery, for which timely requests were filed. The total thus arrived at should be reduced by defendant's undisputed counterclaim for $15,898 (see finding 60), and by $2,000, based on plaintiff's violation of the False Claims Act. Plaintiff has permission, in proceedings under Rule 47(c), to present further proof on the claims on behalf of all subcontractors other than All Metals, Foley, and Manalapan; in the absence of sufficient proof, those claims will be dismissed. The claims on behalf of All Metals, Foley, and Manalapan are remanded to the Commissioner for a determination under Rule 47(c) of the extent of liability for delivered items, if there is any such liability.
 
 
 
 Notes:
 
 
 [1]
 The opinions and findings of Commissioner C. Murray Bernhardt in this case and its companion, Acme Process Equipment Co. v. United States, Ct.Cl., No. 538-59, 347 F.2d 538, decided this day, have been most helpful. The court has borrowed material from both opinions, although, in some respects, our results are different
 
 
 [2]
 No. 538-59, supra, fn. 1, involves the other contract
 
 
 [3]
 This case, like No. 538-59, was tried and the Commissioner's report filed before the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L. Ed.2d 652 (1963). Neither party has preserved an objection to the the receipt ofde novo evidence, and we therefore need not concern ourself with that problem. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963) and succeeding decisions in that line.
 
 
 [4]
 It is impossible to ascertain whether the written contract superseded the prior informal agreement
 
 
 [5]
 In both this case and its companion, we also reach the different question whether the Government can validly refuse to reimburse the plaintiff for payments made to Tucker
 
 
 [6]
 We take into account, in establishing what was a reasonable time for determining whether the covenant against contingent fees was violated, the fact that an evaluation of all the circumstances surrounding arrangement is often necessary. See Acme Process Equipment Co. v. United States, Ct.Cl., No. 538-59, 347 F.2d 538, decided this day. But, as pointed outinfra, the fourteen months which the Government waited before canceling Contract 1213 was an unreasonable delay even by lenient standards.
 
 
 [7]
 There are situations in which the Government can cancel a contract notwithstanding the amount of time elapsing between discovery of the violation and termination of the contract. Such cases, however, involve more than a plain material breach of the contract, as is the case here. See United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), in which the Supreme Court held that a government contract for the construction and operation of a power plant was unenforceable, on the ground that a federal conflict-of-interest statute, 62 Stat. 703, 18 U.S.C. § 434, had been violated in securing the contract. Thatpenal provision "speaks in broad, absolute terms," establishing "a rigid rule of conduct" (364 U.S. at 550, 551, 81 S.Ct. 294), and its violation may result in imprisonment for up to two years and/or the imposition of a fine not to exceed $2,000.
 The only legislation with which we are now concerned is the Armed Services Procurement Act of 1947, § 4, 62 Stat. 21, 23, 10 U.S.C. § 2306(b), which is not a penal statute. It requires that a covenant against contingent fees be inserted in contracts such as plaintiff's and states that, in the event that the covenant is breached, the Government may (i.e., in its discretion) either deduct the commission from the total contract price or annul the contract. Congress gave the defendant a choice, and did not require the voiding of the contract. The violation of the covenant against contingent fees in this case was thus not conduct that was illegal per se, as in Mississippi Valley Generating Co. It was a contractual breach, which the defendant could, under the statute, elect to ignore. Our holding today is that, under that statute, the election to annul could not be unreasonably delayed.
 
 
 [8]
 Plaintiff seeks to impute knowledge of the Tucker contract to the Ordnance District as of January 1953, but we see no basis for such an imputation
 
 
 [9]
 The May 18, 1953, notification included one incorrect statement. The letter said that Tucker had been a full-time employee since January 1953, whereas the contract under which he began working full-time was not effective until March 1953. However, this error did not conceal the existence of the contingent-fee relationship
 
 
 [10]
 As pointed out in the opinion in the other Acme case, No. 538-59, the facts known to defendant by the Spring of 1953 were sufficient to call for an election at that time to use the severe remedy of total cancellation, but the Government's delay after these facts were known was not sufficient to constitute an affirmative waiver of the defendant's conventional right to refuse to reimburse Acme for its illegal payments to Tucker. There is no inconsistency
 
 
 [11]
 Jack Epstein was the son of Joshua Epstein, president of Acme. There is no evidence, however, that Joshua Epstein knew anything about the kickbacks which Tucker and Norris were receiving from subcontractors or the extortion scheme they carried out with his son. Nor is there persuasive evidence that any Acme employee or official other than the conspirators was aware of these illicit activities
 
 
 [12]
 Citing Carrier Corp. v. United States, Ct.Cl., 328 F.2d 328, decided Feb. 14, 1964, the Government claims that the wrongdoers were given broad apparent authority by the plaintiff, and that Acme is therefore bound by their acts. Even if the premise is true, the conclusion does not follow. Imputation of an agent's actions to his principal is precluded where the agent's action is taken for the purpose of defrauding the principal. 3 Fletcher, Private Corporations § 826 (rev. ed. 1947); e. g., Maryland Casualty Co. v. Tulsa Industrial Loan & Investment Co., 83 F.2d 14, 16-17, 105 A.L.R. 529 (C.A.10, 1936). Since the commissions which the Tucker organization received from subcontractors increased their charges to Acme, plaintiff was being swindled by its own agents
 
 
 [13]
 The statute, as originally enacted in 1946, provided: "[T]he payment of any fee, commission, or compensation of any kind or the granting of any gift or gratuity of any kind, either directly or indirectly, by or on behalf of a subcontractor, as hereinafter defined, (1) to any officer, partner, employee, or agent of a prime contractor holding a contract entered into by any department, agency, or establishment of the United States for the furnishing of supplies, materials, equipment or services of any kind whatsoever, on a cost-plus-a-fixed-fee or other cost reimbursable basis; or to any such prime contractor or (2) to any officer, partner, employee, or agent of a higher tier subcontractor holding a subcontract under the prime contract, or to any such subcontractor either as an inducement for the award of a subcontract or order from the prime contractor or any subcontractor, or as an acknowledgment of a subcontract or order previously awarded, is hereby prohibited. The amount of any such fee, commission, or compensation or the cost or expense of any such gratuity or gift, whether heretofore or hereafter paid or incurred by the subcontractor, shall not be charged, either directly or indirectly, as a part of the contract price charged by the subcontractor to the prime contractor or higher tier subcontractor. The amount of any such fee, cost, or expense shall be recoverable on behalf of the United States from the subcontractor or the recipient thereof by set-off of moneys otherwise owing to the subcontractor either directly by the United States, or by a prime contractor under any cost-plus-a-fixed-fee or cost reimbursable contract, or by an action in an appropriate court of the United States. Upon a showing that a subcontractor paid fees, commissions, or compensation or granted gifts or gratuities to an officer, partner, employee, or agent of a prime contractor or of another higher tier subcontractor, in connection with the award of a subcontract or order thereunder, it shall be conclusively presumed that the cost of such expense was included in the price of the subcontract or order and ultimately borne by the United States. Upon the direction of the contracting department or agency or of the General Accounting Office, the prime contractor shall withhold from sums otherwise due a subcontractor any amount reported to have been found to have been paid by a subcontractor as a fee, commission, or compensation or as a gift or gratuity to an officer, partner, employee, or agent of the prime contractor or another higher tier subcontractor."
 
 
 [14]
 It is of course clear that "a person who knows that another has employed an agent to conduct a transaction with him is subject to liability to the other for secretly employing the [agent] to act on his account in the transaction. * * * The defrauded principal can rescind the transaction with the other principal * * *." Restatement, Agency 2d § 391, Comment "g". That principle would have enabled Acme to cancel its agreements with the subcontractors, but it could not give the defendant a right to cancel its contract with Acme. See Acme Process Equipment Co. v. United States, Ct. Cl., No. 538-59, 347 F.2d 538, et seq., decided this day
 
 
 [15]
 "It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action. In the absence of aplain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy. The courts must be content to await legislative action." (Emphasis added.)
 
 
 [16]
 Like its predecessor, the 1960 statute was given retroactive effect, and thus might conceivably be a "statutory enactment" on the basis of which the contract could be canceled. This would result, however, in the use of legislation enacted in 1960 to condemn conduct taking place in 1953-1954, and to justify a forfeiture. We think the Court in the Muschany case was referring to "statutory enactments"in esse.
 
 
 [17]
 The district court decision in the criminal case does not collaterally estop the Government from asserting the applicability of the 1954 Anti-Kickback Act to the present contract. See United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 492-494, 70 S.Ct. 711, 94 L.Ed. 1007 (1950)
 
 
 [18]
 The defendant urges that a ruling against cancellation will render it impossible for the Government to annul an agreement with a prime contractor after discovering that its agents have secret kickback arrangements with its subcontractors. We see no such consequence. If the defendant wishes to provide itself with that remedy, it may do so by inserting a "covenant against kickbacks" (similar to the covenant against contingent fees) in all its contracts. And the Anti-Kickback Act may be amended to provide that special relief, if it is desirable
 
 
 [19]
 The conflict-of-interest provisions allegedly violated have since been superseded by Public Law 87-849 (76 Stat. 1119, 18 U.S.C. § 201 et seq.), enacted October 23, 1962, an omnibus exposition and revision of all statutes in the field of conflict-of-interest, bribery and graft relating to government employment. Since the acts complained of occurred prior to the omnibus measure they must be tested against the law then extant, but useful information on the purpose of the superseded statutes is available from the legislative background and content of the latest compendium
 
 
 [20]
 On his return to Philadelphia Ordnance District from this trip, Hochstuhl submitted a voucher and was paid for his per diem and other trip expenses. An Acme employee had paid $12.50 for Hochstuhl's hotel room charges on the trip, and this expense was charged by Acme against the contract. The defendant suggests that this payment violates the conflict-of-interest provision discussed in connection with Lee. Even if it were a violation, the $12.50 gratuity would not justify cancellation of a $1,200,000 contract
 
 
 [21]
 The statute provides: "Forfeiture of fraudulent claims. A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
 In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture."
 
 
 [22]
 The relevant portions of this statute read as follows: "Liability of persons making false claims. Any person * * * employed in the service of the United States, who shall make or cause to be made * * * any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, * * * shall forfeit and pay to the United States the sum of $2,000 and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit * * *."
 
 
 [23]
 Defendant claims that the ceiling price is a reflection of all the items submitted in the claim, and therefore, if allowed, it necessarily includes a proportionate part of the allegedly improper costs. The argument might be more convincing if plaintiff's costs had not so greatly exceeded the ceiling price. In the present context, the Government's contention ignores reality
 
 
 [24]
 Defendant mistakenly relies on Wagner Iron Works v. United States, 174 F. Supp. 956, 146 Ct.Cl. 334 (1959). That case was unlike this one in a number of ways. It involved flagrant padding by inclusion of personal expenses in a cost-plus-a-fixed-fee contract. Furthermore, the scheme was carried out by the corporation's sole stockholders, whose personal intent to defraud the United States was clearly established
 
 
 [25]
 Assuming an implied contractual covenant to maintain accurate accounting records, the defendant has also failed to prove that Acme breached such a warranty. The only reason that plaintiff's accountants could not certify its 1954 cost statement was that the firm had not been present to watch the taking of a physical inventory. The accountants' refusal to certify Acme's statement of costs had nothing to do with any inaccuracy or impropriety of the contractor's records. Cf. Little v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957)
 
 
 [26]
 The Park Motors case held that the clause of the False Claims Act with which we are concerned requires a finding of specific intent to defraud. But the language of the statute discloses no such element. Since "proceedings [under the False Claims Act] are remedial and impose a civil [rather than a criminal] sanction." (United States ex rel. Marcus v. Hess, 317 U.S. 537, 549, 63 S.Ct. 379, 387, 87 L.Ed. 443 (1943)), we see no justification for adding a requirement that specific intent to defraud be proved
 
 
 [27]
 United States for use of Susi Contracting Co. v. Zara Contracting Co., supra, 146 F.2d at 610, a leading case in this area, involved unit prices in a construction contract, and the defendant contends that recovery on the basis of restitution must be limited to cases of that nature. But neither Zara nor any of the other cases or commentaries intimate the existence of such a restriction
 
 
 [28]
 These cases contain broad statements to the effect that "quantum meruit cannot be allowed where there is a valid contract between the parties." Frazier-Davis Constr. Co. v. United States, supra, 100 Ct.Cl. at 162. In each one, however, quantum meruit relief appears to have been considered, as an alternative, only after the court found that the contract was not breached.
 
 
 [29]
 Relying on United States v. Penn Foundry & Mfg. Co., 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949) and Chain Belt Co. v. United States, 115 F. Supp. 701, 714-715, 127 Ct.Cl. 38, 59 (1953), the Government claims that Acme is not entitled to restitution on the basis of its costs, because those costs were in no way caused by the defendant's breach. The cited cases treat with the disallowance of lostprofits as damages when they are too speculative. Since the theory behind restitution is to restore the status quo ante, potential profits under the rescinded contract are irrelevant.
 It is likewise immaterial that, under a convenience-termination, plaintiff's recovery would be limited by its costs and the ceiling price. The cancellation here was for the contractor's fault, and in such a situation the rule of John Reiner & Co. v. United States, supra, is inapplicable if there was in fact no default. See Klein v. United States, supra; Goldwasser v. United States, 325 F.2d 722, 163 Ct.Cl. 450 (1963); Litchfield Mfg. Corp. v. United States, Ct.Cl., 338 F.2d 94, 96, decided Oct. 16, 1964; Dale Constr. Co. v. United States, Ct.Cl., No. 134-157, decided Dec. 11 1964, slip op., p. 26; Nesbitt v. United States, supra.
 
 
 [30]
 Acme's misrepresentations to the defendant concerning Tucker's employment form as additional ground in this case for holding that the covenant was breached
 
 
 [31]
 The legal fees incurred by plaintiff in defending suits brought by subcontractors and in submitting its termination claim did not add to the value of its services, and therefore may not be considered in calculating plaintiff's recovery
 The computation of recovery should, however, take into account that, on two occasions, the defendant ordered Acme to suspend further operations until given instructions to continue. See findings 42(b), 47. Any stand-by costs incurred by plaintiff during these periods are compensable, since they added to the value of its performance.
 
 
 [32]
 Although the main contract also contained a government-furnished property clause, it was superseded by the more extensive provisions of the separate facilities agreement
 
 
 [33]
 See, also E. H. Sales, Inc. v. United States, Ct.Cl., 340 F.2d 358, decided Jan. 22, 1965; Topkis Bros. v. United States, 297 F.2d 536, 155 Ct.Cl. 648 (1961), rehearing denied, 299 F.2d 952, 155 Ct. Cl. 680 (1962). In Ekco Products Co. v. United States, 312 F.2d 768, 160 Ct.Cl. 75 (1963), plaintiff was permitted to recover breach-of-contract damages for costs resulting from defective government-furnished property. In that case, the contract contained no disclaimer, and a warranty of fitness could reasonably be implied from the contractual provisions. See 312 F.2d at 771, 160 Ct.Cl. at 80-81, 92-93
 
 
 [34]
 Since no administrative proceedings were held on any item of damage including this one, it may be assessed, together with the other elements of recovery, under our Rule 47(c). See Stein Bros. Mfg. Co. v. United States, supra, 337 F.2d 861, 162 Ct.Cl. 802
 
 
 [35]
 The defendant also relies on provisions of the facilities contract which make no mention of liquidated damages, but which require plaintiff to make a written request for an equitable adjustment in the time of performance, if the government-furnished machinery is defective. Assuming that these provisions are applicable to liquidated damages, we think that plaintiff's letters of May 20 and June 21, 1954 (seeinfra) satisfied this requirement.
 
 
 [36]
 Since the Army had decided to discontinue the use of 75 mm. rifles at the time Acme's contract was canceled, proof of actual damages would be virtually impossible
 
 
 [37]
 Since the issue of liquidated damages has been resolved in Acme's favor, it is unnecessary to pass on the broad contention advanced by plaintiff that, when the contractor is given restitutionary recovery, the contract is effectively wiped out, and the Government automatically loses any rights it may have had under the liquidated damages clause
 
 
 [38]
 Foley's payments were actually made to Neptune Manufacturing Company, a dummy corporation formed by Tucker and Norris to carry out their kickback activities. When it paid the kickbacks, Foley knew of Tucker's relationship to Neptune. Tr. 657-58
 
 
 [39]
 The rule that a party knowing of the double agency may not disavow the contract is traditionally stated in terms of actual knowledge. In the present case, both Foley and Manalapan denied having such knowledge. Tr. 668, 682. Judging from the circumstances, however, these two subcontractors were hardly innocent parties and at the very least, can plainly be saddled with constructive knowledge
 
 
 [40]
 The agreements with both All Metals and Manalapan specifically provided that, if the defendant terminated the prime contract, Acme would be liable to the subcontractor only to the extent the latter's claims were allowed and paid by the United States. See finding 64(b), (c). With regard to these two claimants, if Acme's purported ratification were allowed to stand, its effect would be to make the defendant exclusively liable
 
 
 [41]
 Since this principle is determinative for the present, we need not at this stage consider the Government's defense based on the "Severin" doctrine. See Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944)
 
 
 [42]
 This measure of damages is of course far less than that which Acme itself is receiving, since it is recovering the reasonable value ofall its services, whether they resulted in actual deliveries to the United States or not. To the extent that the three subcontractors incurred expenses on unfinished or undelivered goods, they may not recover. This disparity is only fair, since Acme is recovering on a contract breached by the United States, while each subcontractor's agreement must be treated as rescinded because it was fraudulently procured from Acme.
 
 
 [43]
 We do not reach the issue of whether there would be a taking (for which just compensation should be paid) if bad faith on the part of the defendant had been shown. In addition, we point out that the statute of limitations bars recovery by the plaintiff on this ground. Acme first alleged a Fifth Amendment taking in an amendment to its petition, filed in September 1961. Since the amendment stated a new cause of action, it had to be filed within six years after the claim accrued. See Dawnic Steamship Corp. v. United States, 90 Ct.Cl. 537, 580 (1940). But all events fixing the defendant's liability for the alleged taking had occurred on or before January 1, 1955. Plaintiff's claim having accrued by that date, it is barred by the six-year statute of limitations. The fact that settlement of negotiations continued thereafter is irrelevant. See, e.g., Cuban Truck & Equipment Co. v. United States, Ct.Cl. No. 245-57, decided June 12, 1964, 333 F.2d 873, 877-879; Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 411, 142 Ct.Cl. 165, 168 (1958)